## UNITED STATES v. ILLINOIS ALCOHOL CO. et al. *

### No. 35.

Circuit Court of Appeals, Second Circuit.

Nov. 3, 1930.

Louis Halle, of New York City (Milton R. Kroopf, of New York City, of counsel), for appellants.

Richard H. Templeton, U. S. Atty., of Buffalo, N. Y. (Joseph J. Doran, Asst. U. S. Atty., of Rochester, N. Y., of counsel), for the United States.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge.

Six defendants of the thirty-three individuals and four corporation defendants named in this indictment, were convicted of conspiracy to violate the National Prohibition Act (27 USCA). Four, Berney, Bloom, Illig, and Maundrell, have appealed from that conviction. The indictment contains one count, and charges that the appellants conspired to "manufacture, possess, keep, barter, sell, transport, deliver, distribute, accept and receive intoxicating liquors to wit, alcohol," which contained more than one-half of 1 per cent., fit for beverage purposes other than as authorized by the National Prohibition Act. It sufficiently charges the conspiracy, and alleges that the appellants with other defendants were the actual owners and operators of the alcohol denaturing plant of the Illinois Alcohol Company of Buffalo, which was represented to be owned and operated by another corporation, the Illinois Alcohol Company of Belvidere, Ill. It charged that the appellant Illig leased a warehouse in Buffalo for the purpose of transferring shipments of alcohol from the industrial plant in Belvidere, Ill., and from the denaturing plant in Buffalo, and from the latter shipments of completely denatured alcohol were made to other points, that the appellant Maundrell

*Certiorari denied Berney v. United States, **51 S.** Ct. 214, 75 L. Ed. —.

arranged for certain shipments of completely denatured alcohol from the plant in Buffalo, supposedly purchased by various firms, many of which were fictitious, in order to make possible diversions from the denaturing plant of the like amount of pure grain alcohol, and that Bloom and Berney did, on various occasions, bribe and offer to bribe officers of the United States charged with the enforcement of the law, in order that they would falsify reports as to the business activities and operations of the denaturing plant.

▌ The Illinois Alcohol Company of Belvidere, Ill., was incorporated in 1924, and of record its entire capital stock was owned by respectable and well-known citizens of Illinois. But it was established on the trial that the interests of other individuals connected with the illicit liquor interests were concealed. The corporation applied for a permit to operate an industrial plant for the manufacture of pure grain alcohol at Belvidere, Ill., in December, 1924. It was granted February 7, 1925. An investigation made by the government, prior to granting the permit, disclosed that the five ostensible owners of the stock of the corporation were of good repute, and resulted in its grant. After the formation of that corporation and prior to the issuance of the permit, the corporation sold its entire capital stock and output of grain alcohol to persons and corporations, formed to represent such persons, none of whom had a permit to receive, purchase, or denature grain alcohol. This was unknown to those in charge of the enforcement of the prohibition law. The contract provided that a denaturing plant should be built and operated in Buffalo, not by the Illinois Alcohol Company of Belvidere, but by those who had purchased the entire stock and output of grain alcohol. On April 20, 1925, the Illinois Alcohol Company of Belvidere applied to the government for a permit to operate a denaturing plant at Buffalo, N. Y., and the government, relying upon the representation that the same interests in Belvidere, to which the permit was granted, were to operate it, on July 13th granted to the Illinois Alcohol Company of Belvidere a permit to establish an industrial denaturing plant at Buffalo, and allowed the Buffalo plant to withdraw 43,000 gallons of grain alcohol per month. Twelve days later, July 25, 1925, the Illinois Alcohol Company of Belvidere complained of the restrictions in withdrawals by the Prohibition Commissioner, and asked for unlimited withdrawals, without disclosing the true common owners of the denaturing plant and the distilling plant. Increased withdrawals were allowed to the extent of 300,000 gallons per month.

A conspiracy was established, and the jury's verdict is sufficiently sustained by the proof. The appellants' activities were in connection with the denaturing plant in Buffalo. The correspondence between the defendant Lasdon and the Illinois Alcohol Company of Belvidere stated that the company was in touch with friends in Buffalo who had considered the possibility of a denaturing plant in that city, but, in view of the objections of the Department to any denaturing plant other than that established by the distillery, it was thought wise to put up the money and establish the denaturing plant in Buffalo under the name of the Illinois Alcohol Company of Belvidere. There was testimony that the appellant Berney had become interested in the proposal, and that he was practically in charge in Buffalo. He was active from the commencement of the enterprise there, and remained so down to the time of the indictment. In March, 1925, he executed a lease for the premises in Buffalo, to be used as a denaturing plant, as attorney in fact for the Illinois Alcohol Company of Belvidere. On July 23, 1925 (the permit was issued July 13th), Berney introduced the defendant Seaman to the Marine Trust Company in Buffalo and opened an account for the Salnod Holding Company, which account was later changed to the Mid-West Holding Corporation, and Berney signed deposit slips for this account. These were corporations which had purchased the capital stock of the Illinois Alcohol Company of Buffalo. The initial deposit of $1,500 made was a check of Berney. It is Berney's contention that his interest in the company represented solely caring for a $50,000 investment of his father's estate in the Illinois Alcohol Company. But his father died June 15, 1926, he was appointed administrator of his estate on June 30, 1926, and resigned in favor of his mother in October, 1926. Moreover, in the appraisal of the estate of his father, he did not mention the estate as having any interest in the Illinois Alcohol Company of Belvidere. Berney was present at the denaturing plant when a prohibition agent went there, and he told him how much money he could make, and explained the method of diverting grain alcohol. He stated that ten men owned the company; that five had sold. On that day 36 drums of grain alcohol were taken from the denaturing plant, and the records show a shipment of the 36 drums of completely denatured alcohol to the Carl G. Maundrell

Company. On the following day there were 100 drums of grain alcohol due to come to the plant and only 30 drums did come. To cover the remaining 70 drums, a shipment of that amount of completed alcohol was reported. In November, 1926, Berney went to the trust company in Buffalo and opened an account under the name of "John Brooks." He closed it in March, and in the five months deposited $164,581. Checks drawn on this account were used to buy alcohol, purchased by the Illinois Alcohol Company through the appellant Bloom from the American Distilling Company, and checks were made payable to the appellants Illig, Maundrell, and Bloom. Fifteen cars of grain alcohol were shipped by the American Distilling Company to the Illinois Alcohol Company in December, 1926, and January, 1927. These were ordered through the appellant Bloom and paid for from an account kept under an assumed name by Berney. These transactions show not only a proprietary interest by Berney in the business of the denaturing plant, but operations resulting in the withdrawal by the ostensible permittee from the denaturing plant of 300,000 gallons of pure grain alcohol a month. In the same space of time, Berney paid the American Distilling Company on behalf of the Illinois Alcohol Company for fifteen carloads more of pure grain alcohol. The Illinois Alcohol Company, the ostensible owner of the Buffalo plant, permitted unlimited withdrawals of alcohol to be received by Berney and others who were in fact the actual proprietors.

The association of Berney and the other coconspirators is fully established. They were together on many occasions under circumstances justifying the inference of a concerted purpose to carry out the object of their conspiracy, operating a denaturing plant and withdrawing grain alcohol at Buffalo, which would not have been permitted if the government had known they intended such withdrawals for such fraudulent purposes. The appellants were at the bank together when Berney opened the "John Brooks" account. They were together at the Queens City Warehouse, which they used as a shipping base, and the warehouse part of which was rented by Illig. The appellants, Berney, Bloom, and Maundrell were together at the office of the Carl Maundrell Company at Buffalo. A young woman employed in that office signed one of the deposit slips for the "John Brooks" account. Berney was connected with the operation of the denaturing plant from the time he executed the lease for the property as attorney in fact for the

Illinois Alcohol Company. He used various dummy corporations and bank accounts and other methods of deception to keep the denaturing plant going under the permit obtained as stated, and to do so was violative of the National Prohibition Act. The argument advanced that there is no evidence as to his connection with the conspiracy is without merit.

Appellant Maundrell assisted in the diversions. Indeed, he laid the foundations for many of them. Employees testified that the Don-o-Lac Company in Rochester was engaged in the paint and varnish business. Maundrell visited this company in October, 1925, offering to sell denatured alcohol for less than the market price. The proprietor purchased fifteen carloads of completely denatured alcohol from the Illinois Alcohol Company through him, but never used any of it, and shipped it all back to Maundrell after the drums had been restenciled at the Don-o-Lac Company's plant. The money which was supposed to have been paid by the Don-o-Lac Company was furnished by Maundrell, and, after retaining 10 cents a gallon, the balance was forwarded to the Illinois Alcohol Company for alcohol which the Don-o-Lac Company had ostensibly purchased. The books of the company show that this same alcohol was sold to customers of the Don-o-Lac Company. This admittedly was false, and the records were made under the direction of Maundrell. This appellant stated that each car of completely denatured alcohol was shipped to the Don-o-Lac Company to offset a shipment of pure grain alcohol. An officer of the Don-o-Lac Company on one occasion received back one of these same drums that had been there before, which would indicate that Maundrell and his coconspirators would ship the drums back and forth each time and report the shipment of fifteen carloads of different drums to cover. The same method was employed by Maundrell with another company, Oxo Gas Company of Erie, Pa. This appellant maintained still another company, known as the "Bison Chemical Company," in a building in Buffalo. Reports of the Illinois Alcohol Company denaturing plant showed 437 drums of completely denatured alcohol were shipped to this concern. He also owned and controlled the Carl Maundrell Company, and it received from the Illinois Alcohol Company several hundred drums of alcohol. It would not be unlawful, of course, if these were legitimate sales, but, as disclosed, they showed a well-devised plan on the part of the appellants and others to violate the national prohibi-

tion law by diversion of grain alcohol and by showing in reports fictitious sales of completely denatured alcohol. Moreover, this appellant told the government agent that the Illinois Alcohol Company was not caught by government agents stopping trucks, because "every time a truck load of alcohol went out of there, there were three or four of completely denatured alcohol going along, you had to just grab the right truck."

The appellant Illig rented space in the Queen City warehouse in Buffalo where the Illinois Alcohol Company and the appellant Maundrell stored alcohol and shipped the same. This appellant had charge of unloading the pure grain alcohol on the railroad cars. He made complaint about the police notifying the Prohibition Department when cars containing grain alcohol arrived on the tracks. He supervised the unloading and transportation of grain alcohol some seven miles from the denaturing plant, when the cars could have been shipped direct to the denaturing plant. In view of this and other testimony, the jury could have inferred that some unloaded there never reached the denaturing plant. He leased an office in a building in Buffalo, using the name of "George K. Brown Company." Shipments of denatured alcohol were made to the "George K. Brown Company" and reported to the government. The bank register of the account of "J. K. Brown" showed checks signed by George K. Brown and referred to transactions with the Illinois Alcohol Company and Maundrell. One check of $3,000, which this appellant indorsed, was drawn by Berney on the "John Brooks" account.

The appellant Bloom was manager of the denaturing plant. He opened an account in November, 1926, for the Illinois Alcohol Company, Inc., a New York state corporation. He signed all the checks of this account from November, 1926, to March, 1928, and the account had total deposits of $157,236. When the government agent visited the plant in July, 1926, this appellant told him that he could make "three or four times as much money as you are making to let us get by with some of this pure grain alcohol." His knowledge of and participation in the conspiracy is fully established.

In less than three years, these appellants, under cover of the permit obtained by the misrepresentation that they intended building a denaturing plant, received, possessed, and sold over 1,000,000 gallons of pure grain alcohol which was fit for beverage purposes. The evidence is clear that they conspired to operate the denaturing plant under the protection of the permit issued, not to them, but to an Illinois corporation, and, in so doing, were allowed to and did withdraw and sell such pure grain alcohol, contrary to the National Prohibition Act (27 USCA §§ 81, 83).

Regulation 61, promulgated pursuant to 27 USCA § 83, regulates the establishment and operation of industrial alcohol plants and denaturing plants. We have held that a violation of these regulations is a crime, and that a conspiracy to violate such regulation (61) is an offense against the United States. United States v. Austin-Bagley Corp., 31 F. (2d) 229 (C. C. A. 2); Meyers v. United States, 36 F.(2d) 859 (C. C. A. 3).

But it is argued that the indictment is void for duplicity because it charges a conspiracy to violate the National Prohibition Act and the crime of bribery. The lower court passed upon this when demurrer was filed to the indictment, and overruled the plea. In charging the crime, the indictment clearly refers to a conspiracy. It relates, however, that appellants Berney and Bloom and the other defendants, unknown to the grand jury, "did upon divers occasions, during the time alleged in this indictment, bribe and offer to bribe officers of the United States, in order that they would make false reports concerning the activities of the aforesaid denaturing plant." The indictment in detail sets forth what each defendant did to carry out the objects of the conspiracy, and charges this act on the part of these appellants as having occurred during the course of the conspiracy. If, in carrying out the conspiracy, the appellants committed another offense against the laws of the United States, the recitation of that offense does not make the indictment void for duplicity, nor does it affect the charge of conspiracy in the indictment. The indictment, in one count, clearly charges a continuing conspiracy to violate the terms of the National Prohibition Act. In Frohwerk v. United States, 249 U. S. 204, 209, 39 S. Ct. 249, 252, 63 L. Ed. 561, the court said:

"Countenance we believe has been given by some Courts to the notion that a single count in an indictment for conspiring to commit two offences is bad for duplicity. This Court has given it none. Buckeye Powder Co. v. Du Pont Powder Co., 248 U. S. 55, 60, 61, 39 S. Ct. 38, 63 L. Ed. 123; Joplin Mercantile Co. v. United States, 236 U. S. 531, 548, 35 S. Ct. 291, 59 L. Ed. 705. The conspiracy is the crime, and that is one, however diverse its objects."

See Allen v. United States, 4 F.(2d) 688 (C. C. A. 7); Chapman v. United States, 10 F.(2d) 124 (C. C. A. 5); Taylor v. United States, 2 F.(2d) 444 (C. C. A. 7); McDonnell v. United States, 19 F.(2d) 801 (C. C. A. 1). It is not void for duplicity.

■ Appellant Bloom argues that he is immune from prosecution because he testified before the grand jury. When subpœnaed before the grand jury which found this indictment, he was directed to produce the books and records of the Illinois Alcohol Company, a corporation. He appeared and declined to sign a waiver of immunity, but produced books and records of the corporation, and was asked certain questions, and gave answers concerning the production of the books and records. He said he was not an officer of the corporation. He filed a plea in bar after indictment setting forth these facts, which was overruled. The record does not contain his testimony before the grand jury, and, from all that appears, the only testimony he gave is a production of the books and records, which he identified. He acted as general manager of the denaturing plant in Buffalo, signed reports of the corporation, opened an account for the corporation, and signed all checks checking out from this account. He signed reports to the government for the corporation, all of which would refute his claim that he was not an officer of the corporation. Section 30, tit. 2, of the National Prohibition Act (27 USCA § 47), provides:

"No person shall be excused, on the ground that it may tend to incriminate him or subject him to a penalty or forfeiture, from attending and testifying, or producing books, papers, documents, and other evidence in obedience to a subpoena of any court in any suit or proceeding based upon or growing out of any alleged violation of this chapter; but no natural person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing as to which, in obedience to a subpoena and under oath, he may so testify or produce evidence, but no person shall be exempt from prosecution and punishment for perjury committed in so testifying."

A person producing corporate books and records before a grand jury and giving testimony as to such production is not entitled to immunity under this section. Any testimony auxiliary to such production is unprivileged as are the documents themselves. Wilson v. United States, 221 U. S. 361, 384, 31 S. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558; Dreier v. United States, 221 U. S. 394, 31 S. Ct. 550, 55 L. Ed. 784; U. S. v. Austin-Bagley Corp., supra; United States v. Lay Fish Co., 13 F.(2d) 136 (D. C. S. D. N. Y.).

■ There was evidence concerning the shipment of two cars, Nos. 88753 and 107411, which it is claimed was improperly admitted. The documents covering these shipments were admitted. As to car No. 88753, they showed it was billed as containing steel strips consigned from the New Process Foundry Company in New York City to the Ridgeway Steel & Wire Works of Chicago, Ill. The car was loaded at the Queen City Warehouse in Buffalo on January 24, 1927, and the freight was paid by the warehouse. The consignor was fictitious as was the consignee. At Youngstown a truck frame of car No. 88753 broke and its contents were transferred to car No. 184227, and later found to contain, not steel strips as billed, but 60 drums of pure grain alcohol. Both appellants Illig and Maundrell argue that there was no connection shown between any of the defendants and the shipment of this car, and these exhibits were erroneously admitted. In permitting the jury to pass upon the connection of the various defendants with this car, the court specifically left the question of their connection, including the appellants', to the jury. It was established that, in addition to the car being loaded at the Queen City Warehouse, a defendant, Wells, as to whose guilt the jury disagreed, was the manager of the warehouse, and he and Illig were together on many occasions at this warehouse, part of which was occupied by Illig. Maundrell was connected with the warehouse, and was there on numerous occasions, and Maundrell shipped alcohol coming from the Illinois Alcohol Company to and from various points using the Queen City Warehouse as to the shipping base. Most of these shipments were negotiated by Maundrell from fictitious consignors to fictitious consignees as was the shipment in question. Wells signed the order for placing of this car. We think that this testimony, whether or not it was admissible, was not of enough moment to result in a reversal. Besides, in view of the disagreement as to Wells, the jury may well have found the appellants blameless as to the transaction. However, there was ample testimony to connect them with other diversions. Car No. 107411 was shipped from the warehouse, containing 20 drums of grain alcohol, billed as vinegar. It too had a fictitious consignee. Other cars, shipped in the same manner, were shown to have been directly connected with Maundrell, Illig, and the Illinois

Alcohol Company; Wells signing the documents covering the shipments. These shipments from the warehouse, continuously used by the Illinois Alcohol Company and by the appellants, closely resembled numerous other shipments. The jury could entirely disregard such evidence, and still, by reason of the evidence showing many other diversions of alcohol, have convicted of the crime charged. Appellant Maundrell made the diversions possible; Berney explained the method of diversion to a government agent; Bloom had knowledge of the diversions; Illig made possible the diversions; and it was shown that the method and operation of doing this was known to each of the defendants. Such circumstantial evidence is offered cumulatively of other evidence, and the trial court's receipt of it was not in any case ground for reversal, as it permitted the jury to pass upon the weight of all the evidence, and the defendants' connection therewith. Ford v. United States, 273 U. S. 593, 47 S. Ct. 531, 71 L. Ed. 793; Clune v. United States, 159 U. S. 590, 592, 16 S. Ct. 125, 40 L. Ed. 269; Harvey v. United States, 23 F.(2d) 561 (C. C. A. 2).

An examination of this voluminous record, consisting of some 7,000 pages and 2,500 exhibits, the result of a trial lasting eight weeks, where many defendants were on trial, discloses that the appellants were afforded a fair and impartial trial, free from error by the rulings of the learned trial judge, and the judgments of conviction must be affirmed.

Judgments affirmed.