## ALEXANDER v. UNITED STATES
### and nine other cases.
#### No. 12081.

United States Court of Appeals
Ninth Circuit.

Dissenting Opinion March 21, 1949.

March 14, 1949.

---

Gallagher, Margolis, McTernan & Tyre, Ben Margolis and John T. McTernan, all of Los Angeles, Cal., for appellants.

James M. Carter, U. S. Atty., of Los Angeles, Cal., and Max H. Goldschein, Frank De Nunzio and Vincent Russo, Sp. Assts. to the Atty. Gen., for appellee.

A. L. Wirin and Fred Okrand, both of Los Angeles, Cal., for American Civil Liberties Union, amicus curiae.

Daniel G. Marshall and Sam Houston Allen, both of Los Angeles, Cal., for Los Angeles and Hollywood-Beverly Hills Chapters National Lawyers' Guild, amicus curiae.

J. Bruce Fratis, George Olshausen and Benjamin Dreyfus, all of San Francisco, Cal., for San Francisco Chapter National Lawyers' Guild, amicus curiae.

Before DENMAN, Chief Judge, and MATHEWS, STEPHENS, HEALY, BONE and ORR, Circuit Judges.

PER CURIAM.

Judges Denman, Stephens and Orr think that the judgments in these cases should be reversed. Judges Mathews, Healy and Bone think that the judgments should be affirmed. The judgments are, therefore, affirmed by an equally divided court.

DENMAN, Chief Judge (dissenting).

This is a case in which the constitutional questions are of such importance that the court, sua sponte, ordered that it be heard in banc. When heard a vacancy existed, and the court was composed of six judges. By an even division of view of the six judges, there is an affirmance.

Now at the time of decision the vacancy has been filled, and this is a court of seven judges. Though of such importance that the appeal required a hearing before six judges, and though the result is such a judicial futility, the court nevertheless refuses to have a decision on the merits by a hearing before seven judges.

I dissent from the court's refusal to set aside its submission and order a rehearing to the end that the important issues before it be decided on the merits of the contentions urged by the litigants. My views, in such a situation, of the court's obligations to its litigants and the law of the circuit will be more fully expressed in an opinion to follow.

March 21, 1949.

DENMAN, Chief Judge.

This is (A) a dissent from the failure to set aside our submission and order a rehearing in banc of seven judges, and (B) a full statement of my reasons for a reversal of the district court, which the per curiam order discloses in part.

A. The denial of appellate justice in refusing to hear the appeals in a court of seven judges.

Because of the weight and importance of the constitutional issues of this litigation the court, sua sponte, required these ten appeals to be heard in banc. The death of Judge Garrecht had caused a vacancy making this a court of six judges. These six heard the appeals and now an evenly divided court fails to adjudicate their merits, and affirms the district court's judgments.

Prior to this decision Judge Pope has been appointed and has qualified. Though the constitutional questions are of such importance that the cases so required a court of six judges for their consideration and though that consideration ended in such a futility, the court refuses to set aside its submission and order a hearing in banc before its seven judges with the certitude that the constitutional issues will receive our decision on their merits.

My reasons for dissenting from such inconsistency and futility [1] are those underlying the contrary practice of the Supreme Court. Under our Rule 9 the practice in this court "shall be the same as in the Supreme Court of the United States so far as the same shall be applicable". Since over ninety-five per-cent of our decisions on the law of the circuit are final the practice

---

[1] Cf. my dissent to the certification of Hirabayashi v. United States, 9 Cir., 140 F.2d 300.

of the Supreme Court in cases of even division of the court are clearly "applicable".

The Supreme Court early in its history adopted the practice of requiring, if practicable, constitutional questions to be heard by a full court in order that the judgment in such case might, if possible, be the decision of the majority of the whole court.

In Briscoe v. Commonwealth Bank of Kentucky, 8 Pet. 118, 8 L.Ed. 887, and Mayor, Alderman and Commonalty of City of New York v. Miln, 8 Pet. 120, 8 L.Ed. 888, when, as with us, the full Court consisted of seven members, this rule was announced by Chief Justice Marshall in the following language: "The practice of this court is, not (except in cases of absolute necessity) to deliver any judgment in cases where constitutional questions are involved, unless four judges concur in opinion, thus making the decision that of a majority of the whole court. In the present case four judges do not concur in opinion as to the constitutional questions which have been argued. The court therefore direct these cases to be reargued at the next term, under the expectation that a larger number of the judges may then be present."

The same cases were again called at the next term of court and the Chief Justice said the court could not know whether there would be a full court during the term; but as the court was then composed the constitutional cases would not be taken up. 9 Pet. 85, 9 L.Ed. 60. The rule laid down by Chief Justice Marshall has been frequently followed. See e. g. Home Ins. Co. of New York v. State of New York, 119 U.S. 129, 148, 8 S.Ct. 1385, 30 L.Ed. 350; Id., 122 U.S. 636, 30 L.Ed. 1241; Id., 134 U.S. 594, 597, 10 S.Ct. 593, 33 L.Ed. 1025; Pollock v. Farmers' Loan and Trust Co., 157 U.S. 429, 586, 15 S.Ct. 673, 39 L.Ed. 759; Id., 158 U.S. 601, 15 S.Ct. 912, 39 L. Ed. 1108.

Nor has the rule been limited to cases of equal division, as a result of the illness of one of the justices, or a temporary vacancy, where the court could expect that a sufficient number of justices would ultimately be present to render a decision by a majority vote. It has also been given effect in the analogous situation where so many of the justices disqualified themselves that the Court, because of the absence of a quorum, could not make final disposition of the case. Thus, in United States v. Aluminum Company of America and North American Company v. Securities and Exchange Commission, 320 U.S. 708, 64 S.Ct. 73, 88 L.Ed. 415, the Supreme Court said: "As four Justices have disqualified themselves from participating in the decision in each of these cases, the Court is unable to make final disposition of them because of the absence of a quorum of six Justices as prescribed by 28 U.S.C. A. § 321 [now § 1]. * * * These cases will accordingly be transferred to a special docket and all further proceedings in them postponed in each case until such time as there is a quorum of Justices qualified to sit in it." Subsequently, one of the justices who had disqualified himself reconsidered his disqualification and participated in the decision in the North American case, which was ultimately decided by the Court with three of the justices who had previously disqualified themselves not participating in the decision. 327 U.S. 686, 711, 66 S.Ct. 785, 90 L.Ed. 945.

Similarly, judges have yielded on their disqualification to the necessity of decision in cases where such disqualification would prevent a determination of the issues presented. Evans v. Gore, 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887, 11 A.L.R. 519; Koki Hirota v. General of the Army MacArthur, 335 U.S. 876, 69 S.Ct. 157.

Even in cases not involving constitutional issues the Supreme Court practice is the same. In the following recent cases the ninth justice was not available for the hearing, as here the seventh judge. As here, the full quota of the court became available before the decision was rendered. The Supreme Court, sua sponte, set aside the submission and ordered reargument to the full bench. Gibson v. United States, 329 U.S. 338, 67 S.Ct. 301, 91 L.Ed. 331; People of State of Illinois v. Campbell, 329 U.S. 362, 67 S.Ct. 340, 91 L.Ed. 348.

Similarly in several cases where by a divided court affirmances were adjudged and thereafter all the nine justices became available. Petitions for rehearing were filed and granted, and the decision by the full court followed. Halliburton Oil Well

Cementing Co. v. Walker, Affirmed by a divided court, 326 U.S. 696, 66 S.Ct. 482, 90 L.Ed. 410. Rehearing granted before the full bench, 327 U.S. 812, 66 S.Ct. 677, 90 L.Ed. 1037. Lower court reversed, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3. Bruce's Juices v. American Can Co., 327 U.S. 758, 66 S.Ct. 527, 90 L.Ed. 992, affirmed by a divided court. Rehearing granted before the full bench, 327 U.S. 812, 66 S.Ct. 801, 90 L.Ed. 1037. Lower court affirmed, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219. MacGregor v. Westinghouse & Mfg. Co., 327 U.S. 758, 66 S.Ct. 527, 90 L.Ed. 992, affirmed by a divided court. Rehearing granted before the full bench, 327 U.S. 812, 66 S.Ct. 801, 90 L.Ed. 1037. Lower court reversed 329 U.S. 402, 67 S.Ct. 421, 424, 91 L.Ed. 380.

Beyond the judicial duty of this Court of Appeals to our litigants and to the determination of the law of the circuit is the possible relief of the Supreme Court by a decision which seems to that Court so clearly the law that certiorari will be denied.[2] Every reason of principle and practice makes it a wrong to the litigants here so to deny them the judicial consideration this court was created to give them.

B. Opinion fully stating my views, partially disclosed in the court's per curiam, on the error in the district court's decision that the answers to questions asked appellants would not tend to incriminate them.

These are ten appeals from judgments holding in civil contempt each of a group of witnesses appearing before the United States grand jury for the Southern District of California for failure to answer the same questions severally put to each and committing them to jail until they shall answer.

The grand jury was investigating the organization and objectives of the Los Angeles County Communist Party. The government strongly contends that this communist party is an entirely innocuous organization, membership in which constitutes no offense against the United States and presses the decisions to that effect in Barsky v. United States, 83 U.S.App.D.C. 127, 167 F.2d 241, 244 and Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796.

Neither case involved a federal grand jury whose activities are confined to the investigation of facts of suspected crimes against the United States and indictment for violation of its criminal laws.[3] In the Barsky case a witness before a congressional committee refused to produce certain records because they might reveal he was a member of a communist party. He was ordered to produce them, 167 F.2d page 244, even if they proved "[he] was a believer in communism or a member of the Communist Party * * *. *The right to refuse self incrimination is not involved.* The problem relates to the power of inquiry *into a matter which is not a violation of law.*" 167 F.2d page 246 (emphasis supplied.)

Obviously, since the grand jury's power of inquiry is confined to matters constituting "a violation of law", and criminal law at that, the purpose of the inquiry into the organization and personnel of this particular communist party of Los Angeles County was to determine whether or not that organization was criminal in character and its personnel were violating some Federal law. No such showing of the reasons why Barsky refused to answer were read before the Congressional Committee as are shown, infra, by appellants in the instant cases.

In Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 1336, 87 L.Ed.

---

[2] Cf. the recent denial of certiorari in International etc., Union v. Wirtz, 69 S. Ct. 641, to review our decision in 9 Cir., 170 F.2d 183, a case of outstanding importance to the scores of thousands of Hawaiian laborers of mixed races, holding them not under the protection of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq.

[3] Cf. the classic grand jury charge of Justice Field distinguishing between the California grand jury's general power of investigation of the civil administration of state officials and the limitation of the federal grand jury's power to criminal matters. Charge to Grand Jury, Fed.Cas. No.18,255. Hale v. Hinkel, 201 U.S. 43, 65, 26 S.Ct. 370, 50 L.Ed. 652; Blair v. United States, 250 U.S. 273, 275, 39 S. Ct. 468, 63 L.Ed. 979.

1796, the Supreme Court reversed the judgment of this court that Schneiderman's naturalization should be set aside because of his membership prior to and at the time of his naturalization in a communist organization of Los Angeles and another communist party, the Young Workers League of America, and that he illegally procured his citizenship by concealing such membership from the naturalization court. There was evidence that these parties sought the overthrow of government by force. Schneiderman testified that he had no such belief or purpose. The district court held against him, and this court affirmed.

The Supreme Court held that mere preponderance of the evidence was not sufficient to support the denaturalization order, but that the evidence must be "clear, unequivocal, and convincing", and on a review of the testimony held that his citizenship should not be revoked. It is clear from the court's opinion that if it had been unequivocally shown that Schneiderman had concealed from the naturalization court that he consciously and purposefully belonged to and was active in the conduct of a party, communist or other, which believed in and sought the overthrow of the government by force, the denaturalization judgment would have been affirmed.

In 1929 when Schneiderman was admitted there was no Smith Act. That act was passed in 1940, and as revised in 18 U.S.C. § 2385, 18 U.S.C.A. § 2385, provides that it is a crime for one to be a conscious "member" of a group which no more than *teaches* the overthrow of our government by force or for one who so "affiliates" with such a group. The portion of sec. 2385 pertinent here is:

"Whoever organizes or helps or attempts to organize any society, group or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof—

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction."

Since the grand jury had no reason to inquire concerning the organization of the Los Angeles Communist Party unless the United States Attorney conducting the proceedings suspected it to be engaged in criminal activities, any witness, and indeed we ourselves, reasonably would infer that the United States Attorney was seeking to show that it was "teaching, advocating or encouraging the overthrow of the government by force or violence", and if so to procure the indictment of its members or affiliates.

Such an inference is further justified by the offer by appellants of clearly material evidence of what the appellants thought of the proceeding, but refused admission by the court as immaterial. It is that the Attorney General under Executive Order No. 9835, 5 U.S.C.A. § 631 note, made an administrative finding that the Communist Party is an organization which advocates the overthrow of the American form of government by force and violence, and that it is his announced plan and intention to obtain a series of indictments under the Smith Act, similar to the indictments procured in the Southern District of New York, actually in evidence. Those indictments are to be sought throughout the United States, including specifically the City of Los Angeles, against other persons based solely upon their membership or alleged membership in the communist party.

Equally compelling is the inference that any such advocacy or teaching the overthrow of the government by force would be under the cover of secrecy. Such criminals do not run around telling decent citizens their criminal intent. Every witness disclosing such facts would be testifying as to how he came to have knowledge of such closely guarded secrets. Obvious also is the fact that the most effective witnesses would be those "in on the secret", i. e., the members or affiliates of the criminal organization.

With a view to uncovering such secret criminality, if it exist, the Assistant Attorney General selected this group of four women and six men. They were subpoenaed, on the morning of October 25,

1948, beginning at seven o'clock. He introduced each of the ten in succession in a single afternoon and succeeding night session of the grand jury. Their common requests for a continuance to produce evidence showing the grounds warranting their refusal to testify were denied and their commitments to jail ordered shortly before midnight of the same day.

The denial of their counsel's plea for a continuance came after fifteen hours of continuous work with their subpoenaed clients and in the court, and the evidence so sought to be produced concerning the pending prosecutions of the members of the communist party in New York, and of the declared intent of the Attorney General so to prosecute communists in Los Angeles. This unexplained haste is unlike the precedent established in Counselman v. Hitchcock, 142 U.S. 547, 550, 12 S.Ct. 195, 35 L.Ed 1110, where a rule to show cause why the witness should not be held in contempt had three days for preparation.

Since each of the witnesses immediately after the early morning service on her or him retained the same counsel and made common refusal to answer identical questions put to each and since the request for a continuance was denied for all, one is compelled to infer that the Assistant Attorney General selected them as a group of which each was deemed by him to have knowledge whether any such secret offenses had been committed through the officers and organization of the Los Angeles Communist Party.

Typical of the questions and answers put to eight of the group are what were asked Alexander and his replies:

"Q. By Mr. Goldschein [Assistant Attorney General]: Your name is Frank Edward Alexander, is that right? A. Yes.

"Q. Where do you live? A. 78 Hurlburt Street, Pasadena.

"Q. I want to let you know before we start that you are not under investigation by this grand jury for any offense. You are merely called here as a witness to give evidence that you may have of certain facts that the grand jury is interested in. Do you understand that? A. I do.

"Q. Now, do you know the names of the county officers of the Los Angeles County Communist Party? A. I refuse to answer that on the basis if may incriminate me.

"Q. You mean that to answer that question would tend to incriminate you for the violation of a Federal offense? A. I just refuse to answer on the basis that it might incriminate me.

"Q. Do you know what the word incriminate means? A. I do.

"Q. Well, let me explain it to you. The word incriminate in connection with this matter means this: that you say that the answer that you may give to the question I asked *will tend to involve you in the violation of one of the Federal laws. Is that your understanding of the term incriminate?* A. I believe so.

"Q. Sir? A. I believe so.

"Q. And you refuse to answer that question? A. On the basis that it may incriminate me.

"Q. Do you know the *table of organization and the duties of the county officers of the Los Angeles County Communist Party?* A. I refuse to answer that on the basis it might incriminate me." (Emphasis supplied).

In determining whether Alexander's refusal to answer on the ground that it would incriminate him because it "will tend to involve [him] * * * in the violation of one of the Federal laws", it will be remembered that he theretofore had shown the court that the federal law he had in mind was the Smith Act, making it a crime not only to be a member but also to be an affiliate in an organization either teaching or seeking the overthrow of the government by force.

If indicted for affiliation with or membership in the Los Angeles Communist Party as such an organization, it is upon the prosecution to show Alexander's knowledge of the necessarily secret "table of organization and the duties" of such a party. To answer "Yes, I know their table of organization and their duties" would be an impugning supplying of the fact of his "knowing the purposes thereof" which is one of the essential factors in the crime created by the Smith Act, supra.

Such an answer "might tend to show that he himself had committed a crime" and is much more than giving testimony which

would be of use "to search out other testimony to be used in evidence against him" as in the Supreme Court's restatement of the principles of Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, controlling the decision in Arndstein v. McCarthy, 254 U.S. 71, 73, 41 S.Ct. 26, 65 L.Ed. 138.

" 'No person * * * shall be compelled in any criminal case to be a witness against himself.' Fifth Amendment. 'This provision must have a broad construction in favor of the right which it was intended to secure.' 'The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime.' Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 197, 35 L.Ed. 1110.

"The protection of the Constitution was not removed by the provision in section 7 of the Bankruptcy Act [11 U.S.C.A. § 25]: 'No testimony given by him shall be offered in evidence against him in any criminal proceeding.' 'It could not and would not prevent the use of his testimony to search out other testimony to be used in evidence against him or his property.' Counselman v. Hitchcock, 142 U.S. 564, 12 S.Ct. page 198, 35 L.Ed. 1110."

In that case Arndstein was held not in contempt because, as stated by the court: "It is impossible to say from mere consideration of the questions propounded, in the light of the circumstances disclosed, that they could have been answered with entire impunity. The writ should have issued." Arndstein v. McCarthy, supra, 54 U.S. page 72, 41 S.Ct. page 26, 65 L.Ed. 138. Here it is clearly *possible* to say that the answers would tend to impugn Alexander and the others of the group.

I am not impressed with the Assistant Attorney General's argument that this group of men and women he chose as witnesses are a combination merely concerned with protecting some person or persons other than themselves. The record clearly shows that it is their own prosecutions they fear. The statement to each by the Assistant Attorney General that the grand jury "is not investigating you" is a naive evasion of the fact that the grand jury was seeking to investigate each as to his or her knowledge, which well could cause the disclosure of his or her "knowing of the purpose" to seek or teach the overthrow of the government of the Smith Act.

Further, the feared prosecution as an "affiliate" with such a group, is ground for refusing to answer the question of the names of officers of the communist party with whom Alexander may have been associated for the secret objective of teaching or seeking the overthrow of the government by force. This is true as to all ten of the group.

Here is not the "merely remote and naked possibility, out of the ordinary course of law and such as no reasonable man would be affected by," of Mason v. United States, 244 U.S. 362, 366, 37 S.Ct. 621, 622, 61 L.Ed 1198. Here is exactly the prosecution that a *reasonable* man would expect if actually guilty of conspiracy or association with conspirators to violate the Smith Act or one innocently associating with such conspirators and ceasing the association on discovery of its unlawful character. Such a conspiracy prosecution as here feared has no semblance to the possible prosecution for violating the Alaska gambling statute in the Mason case. At that time there was in Alaska no such general conspiracy statute as that for defrauding the United States nor a specific statute against conspiring to engage in a gambling game, such as the conspiracy statute in the instant case.

Learned Hand's opinion in United States v. Weisman, 2 Cir., 111 F.2d 260, 261, reversing the lower court, deals with an identical problem. There the question on which the witness claimed privilege was, "Did he know anyone who visited, lived in or stayed at Shanghai in the years 1934 to 1939?" As here, this question is innocuous on its face. As here, the witness showed a reasonable anticipation that he might be indicted as one of a group of persons already indicted for conspiracy to import narcotic drugs from Shanghai, just as exists a conspiracy indictment in New York and the Attorney General's proposal to indict for conspiracy in Los Angeles. So here, the district court should have been reversed.

Similarly, the opinion of Augustus Hand in United States v. Zwillman, 2 Cir., 108 F.2d 802, 803, where the apparently innocuous question as to who were the witness' business associates in certain years was held likely to impugn him with reference to reasonably anticipated prosecution for a conspiracy to violate the liquor laws. The witness was prevented from showing that this answer might tend to incriminate him. There the district court again was reversed, as it should have been in the instant appeal.

Our decision in Miller v. United States, 9 Cir., 95 F.2d 492, 494, is not inconsistent with the impossibility rule of the Arndstein decision. There we affirmed the district court's conviction for a criminal contempt because, the burden being on the witness to show the trial court her apprehension of a prosecution in which her declined answer might tend to impugn her, the evidence on which the trial judge based his decision was not before us. As we stated, "Not having the evidence before us, we cannot say that it showed any such reasonable probability [of her answers impugning her]," nor even a "possibility [her] answers would or could have any such effect."

As to the group of appellants asked the above questions and in addition, "Did you know Ned Sparks?" the tie-in with the reasonable probability of the prior questions' impunity is the offer to show that Mr. Sparks was a prominent officer of the Communist Party. These appellants' defense in a criminal prosecution well may be that they knew no one connected with the Communist Party's conspiracy to violate the Smith Act.

Each of two other witnesses, so justifiably refusing to answer the above questions, stated his occupation as an "organizer". One refused to answer the further question, "By whom are you employed?", the other the further question "An organizer for whom?"

Considering those with the other questions addressed to these appellants, it is clear that it is impossible for us to say that the answers would not have been, "I am an organizer of a conspiratorial group violating the Smith Act," or, "I was once organizer of the Communist Party of Los Angeles County and though I ceased when I was required to violate the Smith Act, despite such cessation, I reasonably anticipate an indictment charging such violation."

Just as rapists, conspirators to lynch and cold-blooded murderers are dangerous menaces to society, so are people intending to overthrow the government by force. Their threatened force so to overthrow the government established by our constitution would accomplish its purpose in part, if it succeeded in overthrowing the basic concept of that constitution that men may not be forced to supply the evidence convicting them of crime. They may be witnesses who, as seen supra, are able to show their innocence if tried, but reasonably fear indictment. No reason exists why, because of the serious character of the offense, they should be denied the liberal interpretation of this constitutional provision of Counselman v. Hitchcock, 142 U.S. supra, page 562, 12 S.Ct. page 197; 35 L.Ed. 1110.

In my opinion, the circumstances in evidence and improperly refused as evidence show that none of the questions should be answered. The district court's judgments should have been reversed.