### HEALEY et al. v. UNITED STATES.
#### No. 12283.

United States Court of Appeals
Ninth Circuit.

Dec. 6, 1950.

Margolis & McTernan, Los Angeles, Cal., for appellants.

Ernest A. Tolin, U. S. Atty., Norman W. Neukom, Herschel E. Champlin, Asst. U. S. Attys., all of Los Angeles, Cal., for appellee.

Before DENMAN, Chief Judge, and STEPHENS and POPE, Circuit Judges.

DENMAN, Chief Judge.

These are five appeals from judgments of criminal contempt in which four were given sentences of a year or more and one, Averbuck, was fined $10.00 for refusing to answer questions put to them in sessions of the grand jury. Each claimed the right to refuse to answer on the ground that the answers would tend to incriminate.

Each is one of the thirty persons selectively chosen and sought to be served around seven o'clock in the morning on the 25th day of October, 1948, for appearance before the grand jury on that day, as described in our opinion in Kasinowitz v. United States, 9 Cir., 181 F.2d 632. Included in the same thirty persons are the appellants in Alexander v. United States, 9 Cir., 181 F.2d 480. All these litigants had the same attorneys, who thus had knowledge of the facts proved in each of these cases. It is stipulated that the records in the Alexander and Kasinowitz cases, supra, are a part of the record before the District Court in the cases in which the instant appeals were taken.

The presentment states the questions were asked in the course of "an inquiry concerning certain employees of the United States Government, who had made false statements to an agency of the Government, in a matter within the jurisdiction of that agency and in connection with the

investigation of their loyalty to the Government, in violation of old Section 80, Title 18. U.S. Code, Revised Title 18 U.S. C.A. § 1001, and other criminal laws of the United States. In pursuance of such *inquiry*, it became necessary for said Grand Jury to inquire into and ascertain the official identity of one Dorothy Healey; the identity of the person or persons in charge of the books and records of the Los Angeles County Communist Party showing or pertaining to the membership of said organization." (Emphasis supplied.)

The presentment further alleged that "each of said questions [refused answer by appellants] was proper and material to the Grand Jury's *inquiry*." (Emphasis supplied.) Hence we are to assume that the questions which appellants refused to answer are those requiring a knowledge in the witnesses of the person or persons in charge of the books and records of the Los Angeles County Communist Party and those concerning the official identity of Dorothy Healey. If any of the questions to which answers were refused can be deemed not relevant to the declared purpose of the presentment, we assume they are not the basis of conviction.

The United States through its Assistant Attorney General Goldschein assured each witness that the investigation did not involve the witness and that he was not under investigation. The purpose of this was "just to put your mind at ease," as stated by the Assistant Attorney General to witness Newman.[1] This is such conduct as is discussed in the Alexander case, supra, 181 F.2d at page 482, and by the Court of Appeals for the Tenth Circuit in Rogers v. United States, 179 F.2d 559, 562.

It appears, however, that appellants' minds were not put at ease by these assurances of the Assistant Attorney General.

Before the presentments were tried on June 23 and 24, 1949, the Department of Justice on June 15, 1949, published a press release which was admitted in evidence at the trial in which the Alexander and Kasinowitz cases, then pending in this court and which involved twenty convictions of contempt of persons of the same group that includes the five appellants here, are described *as a part of the Department's record of "Prosecution * * * against Communists in the United States.* The Department of Justice continues:

"Prosecution action in the courts *against communists.* in the United States was as follows: * * *

"Sixteen *alleged communists* have been convicted in California on charges of civil contempt for refusing to testify before a Federal Grand Jury. Fifteen are out on bail, pending appeal to higher courts, and one was fined and paid $2500 for refusing to answer subpoena, thereby obstructing justice. He will be summoned to appear before the Grand Jury again. *Conviction of 10 of these 16 has been affirmed by the 9th Circuit Court of Appeals in San Francisco, 173 F.2d 867, 181 F.2d 480. The appeals of the other 5 to the Circuit Court are pending."* (Emphasis supplied.)

Such statements would reasonably add to the apprehension of the appellants that they were in danger of prosecution under either the "membership" or "affiliation" clauses of the Smith Act, 18 U.S.C.A. § 2385, or conspiracy to violate it. As seen in the Alexander and Kasinowitz cases, whose records are in evidence, that apprehension was already excited by the New York indictments against eleven persons then being tried for conspiracy to violate the Act, and the eleven individual indictments there for "membership" in the Communist Party of the United States of

1. Further such assurances by the United States Attorney are as follows:
  "Now, this grand jury is investigating a false statement or false statements made by federal employees who are now employed by the government, with reference to certain of their convictions and associations, so that would not involve you at all, since you are not a federal employee nor have you been for the past three years." (Emphasis supplied.)
  "We are not investigating the Communist Party. We are not investigating their official setup. We are not investigating their purposes, we are not investigating their activities materially."

America "a society, group, and assembly of persons who teach and advocate the overthrow and destruction of the Government of the United States by force and violence."

Underlying other questions, the United States contends that because, though unauthorized by statute, the attorneys for the United States offered appellants full immunity if they testified, their refusal to accept the offer makes their subsequent refusal to testify the crimes for which they were convicted. Of their offer of immunity, their brief offers another assurance to relieve the minds of the appellants now before us. It is that "it is inconceivable that once immunity has been offered by the government that it would attempt to turn such evidence against any witness in breach of the good faith in which the assurance was given."

However, their same brief calls our attention to the Whiskey Cases, 99 U.S. 594, 25 L.Ed. 399, where the United States Attorney for the Northern District of Ohio offered a witness such immunity from criminal charges for offenses against the United States revenue law if he would waive his privilege against incrimination and give testimony against himself. This offer the witness accepted and, relying on it, testified, only to have the agreement broken by being prosecuted for the offenses.

Contrary to the assurances of the government's attorneys here, the Supreme Court, 99 U.S. at pages 595-596, 25 L.Ed. 399, of the Whiskey Cases, held of a person accepting such an agreement not to prosecute that it is "clear that he cannot by law plead such facts in bar of any indictment against him, nor avail himself of it upon his trial, for it is merely an equitable title to the mercy of the executive, subject to the conditions before stated, and can only come before the court by way of application to put off the trial in order to give the prisoner time to apply to the executive for that purpose. Rex v. Rudd, 1 Cowp. 331."

The cases were remanded to the district court, which was to postpone the trials to give the defendants time to seek a presidential pardon.

In Smith v. United States, 337 U.S. 137, at page 146, 69 S.Ct. 1000, at page 1005, 93 L.Ed. 1264, the Supreme Court discusses the need for statutes granting immunity to make compulsory the giving of incriminating testimony and states that it must be "absolute" in the following language: "Through Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, it was established that *absolute* immunity from federal criminal prosecution for offenses disclosed by the evidence must be given a person compelled to testify after claim of privilege against self-incrimination." (Emphasis supplied.)

It is obvious that to be indicted with the right to seek a pardon is not the "immunity" which appellee's brief describes as preventing "any attempt to turn such evidence against any" of them. As the Supreme Court states, to seek and accept a pardon implies an admission of guilt. In Burdick v. United States, 236 U.S. 79, at page 94, 35 S.Ct. 267, at page 270, 59 L.Ed. 476, the Supreme Court, contrasting immunity by legislative act with a presidential pardon, states: "This brings us to the differences between legislative immunity and a pardon. They are substantial. *The latter carries an imputation of guilt; acceptance a confession of it.* The former has no such imputation or confession. It is tantamount to the silence of the witness. It is noncommittal. It is the unobstrusive act of the law given protection against a sinister use of his testimony, not like a pardon, requiring him to confess his guilt in order to avoid a conviction of it." (Emphasis supplied.)

It is elementary that in claiming the right not to testify against himself the witness admits no guilt. He well may be entirely innocent of the crime for which he fears prosecution. His situation may be like that of the law school discussed case of the man who has made threats against the life of a murdered man and, happening along after the murder, pulls the knife from the deceased's body and is seen clutching it. Clearly it is no admis-

sion of guilt to refuse to testify to the grand jury concerning such threats. There is no merit to the contention that because of appellee's offer of immunity appellants thereafter committed criminal contempt in refusing to testify.

A distinguishing factor regarding the questions, the answers to which were refused, is that the answer to each required a contact with persons in an organization which well may be shown to be for the criminal purpose of overthrowing the government by force. Such an organization is necessarily a secret one which probably would not keep any records of its criminal activities and particularly of "the membership of said organization" stated in the presentment. The knowledge to answer any of the questions well could require the witness to be "in on the secrets" of the criminal organization and the answers deprive him of his defense that he had no connection whatsoever with it.

Typical are the questions asking for the organizational structure and procedures of the Los Angeles County Communist Party, such as "Can you tell us who is the head of the southern division of the Los Angeles County Communist Party?" or "Can you tell us how many divisions there are in the Los Angeles or the Los Angeles County Communist Party?" or "Can you tell us whether or not the membership or social director would have a list of the members of the Los Angeles County Communist Party?" and those asking for the identity of persons holding described offices in the Los Angeles County Communist Party. These questions were asked in one of two forms: "Do you know who—" (holds the designated office or position) or "Can you tell us the name of—" (the person holding the designated office or position), and those designed to develop Dorothy Healey's connection with the Los Angeles County Communist Party. These questions range from the identical ones involved in the Kasinowitz case, supra (Do you know Dorothy Healey?—her business or occupation?) to such questions as "Did you ever see Mrs. Dorothy Healey with any of the books and records of the Los Angeles County Communist Party?"

We have held in Alexander v. United States, 9 Cir., 181 F.2d 480, 485, that where the membership in such a secret criminal organization later may be charged, such questions are within the privilege against self incrimination.

The appellee offers a new contention, except as to Appelman, for holding criminal the refusals to answer such questions. It is that because the criminal organization ultimately may be shown to have "books and records" of its necessarily secret conduct, these questions must be answered, since by answering the prosecution may be aided in discovering whether there are such books and records and, if they exist, then find out who has them and compel their production.

There would be an obvious devastating effect in a trial on charge of membership in such a secret criminal organization of the accused's admission, "Yes, I know who has its books. They are held and concealed by John Smith." Nothing would be left of his defense that he had never had any connection with any person in the organization. And prior to the trial, what a lead to the Federal Bureau of Investigation to investigate the details of the relationship and dealings between the witness and Smith!

Appellee cites authorities not considered in the Alexander and Kasinowitz cases. Among them are United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, where the person having possession of the books of an association was before a legislative committee and, deliberately refusing to obey the committee's order to produce them, was held in willful default under R.S. § 102,[2] and United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542, where such a person before a grand jury so refused to obey such an order. Also cited is United States v. Fleischman, 339 U.S. 349, 70 S.Ct. 739, where a member of the executive board of an association (which had the power to compel its secretary to produce its records) made no effort to

---

2. 2 U.S.C.A. § 192.

bring about compliance with a subpoena issued by a Congressional Committee to cause their production and was held in willful default under R.S. § 102.

Appellee also cites cases holding that where the records of an association are produced or ordered produced by their custodian, he must further give testimony ancillary thereto as to the organization or organizations they cover. Such cases are United States v. Austin Bagley Corporation, 2 Cir., 31 F.2d 229, 234; Lumber Products Ass'n v. United States, 9 Cir., 144 F.2d 546, 553; United States v. Illinois Alcohol Unit, 2 Cir., 45 F.2d 145, 149 and United States v. Greater New York Live Poultry Ass'n, D.C.N.Y., 34 F.2d 967. The testimony referred to in such cases as "ancillary" to the records is that of their custodian. The word "ancillary" was not held to cover incriminating testimony of persons not in charge of such records, which may lead to proof of their existence and if existing who is their custodian.

Appellants contend these cases are distinguishable in that the persons in control of the records were not holding their offices in an association whose whole purpose is criminal, i. e., to overthrow the government by force. We do not agree. If the officer must produce the records though incriminating, it is no excuse that he holds them in a criminal venture.

■ We see no relevance in these cited cases except as to Mrs. Healey. Appellee does not contend that any other appellant is a person, much less a member or officer, of the Communist Party of Los Angeles who has in his possession or control any of its records or is in a position to cause their production. Indeed, none .save Mrs. Healey was asked if he possessed any records. We hold as to Appelman, Averbuck, Greenfield and Newman that they had a reasonable apprehension that the answers they refused to give to the questions asked would be incriminating and that they were entitled to assert their privilege. We reverse the judgments from which they appeal. Kasinowitz v. United States 9 Cir., 181 F.2d 632; Estes v. Potter, 5 Cir., 183 F.2d 865.

■ With regard to Mrs. Healey and the records which the government was seeking to show existed at the grand jury session of May 26, 1949, the government offered evidence, given by a former party member, of conditions existing in the summer of 1947, over a year and a half before. It is to the effect that Mrs. Healey then was organizational secretary and membership director and that she had a controlling or executive position in the Communist Party; that she then was in control of the day to day activities of the party membership and its officers; that she then had her office at 124 W. Sixth Street in Los Angeles; that the then head of the Los Angeles Communist Party was Nemmy Sparks whose title was "Chairman of the County Central Committee"; and that Mrs. Healey then was next in charge as "Organizational Secretary."

The informer further testified that the Los Angeles Communist Party in the summer of 1947 was divided into divisions, the divisions into sections and the sections into clubs, to which each member belongs, and a written statement was made by each member and delivered to the head of the club to which he belonged.

On this informer's testimony it is conceivable that in the summer of 1947 Mrs. Healey was an officer of the party and might have been the custodian of or in control of the records then existing. However, that, despite the New York prosecutions and the declared policy of the Attorney General, she retained until May 1, 1949 an official position by which she waived her constitutional right to refuse to give incriminating testimony concerning records in her possession or control, is as the Supreme Court has recently said "not lightly to be inferred" nor determined "upon vague and uncertain evidence." Smith v. United States, 337 U.S. 137, 150, 69 S.Ct. 1000, 1007, 93 L.Ed. 1264.

A year and a half later, in May 1949, Mrs. Healey was summoned before the grand jury to testify concerning records, if any then existed, of the Communist Party of Los Angeles showing membership in that organization. On the ground they

were incriminating because they assumed her knowledge concerning such a necessarily secret criminal organization she refused to answer certain questions. The refusals as to six of them are the basis of the appellee's contention here that her conviction is justified.

It will be noted that all the six questions concern Mrs. Healey's present knowledge of the records, she having testified that she (a) has no control of the records at all; (b) never was in charge of them; (c) never had them in her possession and (d) that they were not made by anyone under her direction. The six questions, all in the present tense, are:

"Now, Mrs. Healey, do you know who *has* the books and records of the Los Angeles County Communist Party?

"Can you tell us who *has* the record showing the dues paid by the membership of the Los Angeles County Communist Party?

"Now, Mrs. Healey, can you tell us the name of anyone who can give us that information I just asked you?

"But that information is available, is it not?

"*Does* the membership or social director of each division *have* a list of the membership of that division?

"*Do* not the membership director and the financial director *have* the books and records of the Los Angeles County Communist Party?" (Emphasis supplied.)

The court ordered her *to return to the grand jury* to answer them. She again claimed her privilege but further testified that she did not know of the *existence* of any of the records showing the membership in the Communist Party. Her testimony is

"On June 11, 1949, I was served with two subpoenaes duces tecum directing the production of the following records: 1, the books and records of the membership in the Communist Party of Los Angeles and Los Angeles Committee of the Communist Party; 2, books and records showing dues paid by members of the Communist Party of Los Angeles and the Los Angeles Committee of the Communist Party; 3, mimeographed questionaire sheets filled out by members of the Communist Party of Los Angeles and the Los Angeles Committee of the Communist Party.

"I am unable to produce any membership records of the Communist Party of Los Angeles or of the Los Angeles Committee of the Communist Party, or any of the records asked for in the subpoena duces tecum, because I do not have possession, control or custody or access to any such records.

"As a matter of fact, *I do not know of the existence of any records concerning which you have questioned me* or any records described in the subpoena duces tecum to which I referred, or of any records whatsoever showing the names of members of the Communist Party of Los Angeles or of the Los Angeles Committee of the Communist Party." (Emphasis supplied.)

Here, in effect, is an answer to each of the questions. "I do not know of the existence of any such records." Such testimony of a layman does not seem criminally contemptuous conduct.

There is nothing in the record before us which will warrant the inference that Mrs. Healey committed perjury in giving such testimony as to her knowledge of conditions in 1949. On the contrary, it is obvious that quite likely such criminally convicting records, if they existed in 1947, had been destroyed[3] by someone. Yet no ques-

---

3. For, as seen, within this year and a half prior to the grand jury session of May 1949 came the indictments of the New York grand jury for violation of the Smith Act by membership in the Communist Party as one seeking to overthrow the government by force; the announcement of the Attorney General that the Communist Party of the United States sought to alter the form of government by unconstitutional means. Also was the statement of the United States Attorney in the Los Angeles Examiner of October 27, 1948, admitted in

tions were asked concerning their destruction and, if destroyed, of their contents. It cannot be said that Mrs. Healey is shown to be responsible for their unavailability or is impeding justice by not explaining what happened to them.

■ The situation is that stated in United States v. Bryan, 339 U.S. 323, 330, 70 S.Ct. 724, 730, respecting the duty of an officer of an association. "Ordinarily, one charged with contempt of court for failure to comply with a court order makes a complete defense by proving that he is unable to comply. A court will not imprison a witness for failure to produce documents which he does not have unless he is responsible for their unavailability, cf. Jurney v. MacCracken, supra [294 U.S. 125, 55 S.Ct. 375, 79 L.Ed. 802], or is impeding justice by not explaining what happened to them, United States v. Goldstein, 2 Cir., 1939, 105 F.2d 150."

■ Furthermore, even if Mrs. Healey had not answered the six questions upon which the appellee relies to sustain Mrs. Healey's conviction, appellee cites no case extending the doctrine of absence of immunity of officers or persons holding records of such an association to those not holding them, as to questions concerning the possession of the records by some other person. It is not a case where Mrs. Healey had accepted the office of custodian of the records, as in the Second Circuit case of United States v. Austin Bagley Corp., 31 F.2d 229. Rather, it is like the more recent Second Circuit case of United States v. Daisart Sportswear, Inc., 169 F. 2d 856, where, at pages 861-862, that court stated: "* * * It is true a corporate officer may be compelled to produce corporate records even though they tend to incriminate him, Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas. 1912D 558, and may even be compelled to testify as to the genuineness

of corporate documents, United States v. Austin-Bagley Corporation, 2 Cir., 31 F. 2d 229, certiorari denied Austin-Bagley Corporation v. United States, 279 U.S. 863, 49 S.Ct. 479, 73 L.Ed. 1002. Yet we do not believe that the principle of the Austin-Bagley case, supra, may be projected so that a corporate officer may be compelled to testify as to any and all phases of the corporation's activities, without at the same time obtaining a grant of immunity for the incriminating matter he is compelled to disclose."

Beyond testifying concerning records in his possession or under the control of the officer, he can in the language of Wilson v. United States, 221 U.S. 361, 385, 31 S. Ct. 538, 546, 55 L.Ed. 771, "decline to utter upon the witness stand a single self-incriminating word."

The judgment of conviction of each appellant is reversed.

POPE, Circuit Judge (concurring).

In my opinion the same result is required wholly apart from what is said about the assurances given the witnesses by the prosecutor, and about the press releases of the Department. The court's opinion suggests that the assurances were false. I think that if we assume they were true and that it was the Department's present intention not to proceed against these witnesses, or to investigate them, their right to refuse to answer would be no less, for their privilege is not dependent upon the current intention of the prosecutor, which might change the next day.

Reasonable cause for apprehension existed by reason of (1) the existence of the Smith Act, plus (2) the fact that indictments of others had been returned under the "affiliation" clause of that Act. It was therefore unnecessary to bolster those facts with evidence of the Department's press releases.

---

evidence in the Kasinowitz case, 9 Cir., 181 F.2d 632, 633, and by stipulation here, that "Communist groups and activities in California are scheduled to undergo a 'top to bottom' investigation by

a special grand jury here" and "This is only the opening gun in the government's inquiry into subversive and disloyal groups."