### Ex parte VILARINO.

### VILARINO v. GARRITY, Immigration Inspector.

#### No. 6418.

Circuit Court of Appeals, Ninth Circuit.
June 8, 1931.

John Beardsley, of Los Angeles, Cal., for appellant.

Samuel W. McNabb, U. S. Atty., Harry Graham Balter, and Lewis M. Andrews, Asst. U. S. Attys., all of Los Angeles, Cal. (Harry B. Blee, U. S. Immigration Service, of Los Angeles, Cal., on the brief), for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and ST. SURE, District Judge.

SAWTELLE, Circuit Judge.

This is an appeal from a judgment of the United States District Court of the Southern District of California, Central Division, dismissing a writ of habeas corpus and remanding the petitioner for deportation to Spain as an alien illegally in the United States. 47 F.(2d) 912.

The appellant was born in the Province of La Coruña, Spain, January 1, 1885. He first came to the United States in 1903, and has lived in this country during most of the time since that date, having worked in 1908 and 1909 on a steamship plying between New York and Argentina. He is married, and has a large family, all of whom reside in Los Angeles.

On February 26, 1930, Vilarino was arrested by police officers of the city of Los Angeles, Cal., at the headquarters of the Communist Party, in Los Angeles, immediately after a Communist riot in the Plaza, at which disturbance, according to the testimony Vilarino was present. The charge was suspicion of criminal syndicalism, a felony under the law of California. Three days later, the United States Immigration Service instituted deportation proceedings against the alien.

The deportation of Vilarino was sought on two separate grounds: first, that he was a member of an organization, association, society, or group that believes in, advises, advocates, and teaches the overthrow by force or violence of the government of the United States; second, that he was a member of an organization, etc., that writes, circulates, distributes, prints, publishes, and displays written or printed matter advising, advocating, and teaching the overthrow by force or violence of the government of the United States. See 8 USCA 137 (c) and (e).

Three hearings were held before the immigration inspector. In his assignment of errors, appellant sets forth that the order of the District Court was erroneous in dismissing the writ of habeas corpus, on the following grounds:

(1) Because petitioner was not given a fair hearing before the Immigration Service and the Department of Justice; (2) because evidence was used against petitioner which had been taken from his possession illegally; (3) because the evidence was not sufficient to sustain the charges made and the issuance of the warrant of deportation.

In his brief, appellant states his three grounds as follows: "The principal ground of appellant's attack is that the hearings accorded him on order to show cause why he should not be deported, were unfair in these particulars:

"1. That incompetent evidence was received against him over objection of counsel, seasonably made.

"2. That petitioner was not accorded the right of counsel at all stages of the proceedings.

"3. That petitioner was not accorded the right of cross-examination of witnesses against him at all stages of the proceedings."

In view of these contentions, the dates, the sequence, and the substance of the proceedings before the inspector have bearing upon the law of the case. We will therefore summarize the hearings seriatim, in so far as they are pertinent to the issues, as disclosed by the Immigration Service file submitted to this court, since the briefs and the transcript of record are not specific as to certain necessary details.

The first proceeding was an "investigation of status," held at the Immigration Office in Los Angeles March 1, 1930. Vilarino was not represented by counsel, and declined to answer questions unless his lawyer was present. Nevertheless, the inspector proceeded with his examination, having made the following preliminary statement to the alien: "You are advised that I am a United States Immigration Officer and as such it is my duty to inquire into your right to be and remain in the United States. I want to give you an opportunity at this time to make a statement in that regard. You are advised that

any such statement as you may make, should the facts warrant, will likely be used in further proceedings, and, further, that the law places the burden of proving your right to be and remain in the United States upon you."

In answer to a question, the alien refused to deny or affirm that he was a member of the Communist Party.

One of the officers that had arrested the alien was called to testify at the first hearing. The officer stated that Vilarino was present at the riot in the Plaza staged before his arrest, and that the alien had said "Yes and no" in answer to a question as to whether or not Vilarino was a member of the Communist Party. At the close of this first hearing, the inspector asked Vilarino whether he had anything to say regarding the testimony of the police officer. The alien refused to answer at first, but did make a brief statement regarding his previous answer when arrested, as to his membership in the Communist Party.

On the same day, March 1, the appellee sent a radiogram to the Immigration Bureau at Washington and a confirmatory request by mail, asking that a warrant of arrest of Vilarino be issued by the Secretary of Labor, on the two grounds set forth above. The mailed request inclosed a copy of the proceedings held before the inspector on that same day. On March 4, 1930, by telegraph and by mail, the Department of Labor at Washington sent a warrant for Vilarino's arrest, setting forth the same two grounds.

On March 5, 1930, in the county jail at Los Angeles, a brief "hearing to show cause" was held before the same inspector who presided over the first hearing. The telegraphic warrant of arrest was shown to the alien, and the code words explained to him. He was told of his right to be represented by counsel, and, on his indication that he wished to avail himself of that right, the hearing was postponed to March 15, 1930.

On March 15, in the Immigration Office at Los Angeles, there was held the continued "hearing to show cause." Vilarino was represented by counsel. The warrant of arrest was again read, and all the evidence upon which such warrant was based was presented for the alien's inspection. This evidence was read to the alien, at the latter's suggestion. His counsel noted an objection. After some preliminary discussion, the following questions were asked by the inspector and the following answers were made by the alien, still in the presence of his counsel:

"Q. Were any threats of violence used in securing the statement from you [on March 1]? A. No; you treated me nice.

"Q. Do you still deny that you are a member of the Communist Party? A. I am a member of the Communist Party, yes.

"Q. How long have you been a member? A. About three years, I believe."

Then followed a number of questions as to Vilarino's membership in the Communist Party, some of which he did, and some of which he did not, answer. He said that the statements made by him on March 1 were voluntary.

In answer to the questions propounded to him by his counsel, the alien asserted that he did not know that the Communist Party of the United States advocated or distributed literature advising the violent overthrow of the government of the United States.

The alien was shown a number of cards and other papers purporting to be connected with the Workers' Communist Party, most of which documents he identified as belonging to him.

The next witness was a detective lieutenant in the Los Angeles police department, who testified that he had been a member of the Communist Party for 11 months in 1922, and that, from his past membership therein, from his study of the movement in the United States, and from official documents published by the party which he had in his possession, he would say that the Communist Party of America advocated the forcible overthrow of the government of the United States. The same officer also testified that he had ordered the alien's home to be searched without a warrant.

Thereupon the alien's attorney made formal demand for the return to his client of all papers thus taken from his place of residence. The inspector denied the request.

One of the officers that arrested Vilarino was then called to the stand, for cross-examination by counsel for the alien. The attorney made the following preliminary statement to the witness: "The Inspector has kindly given me the opportunity to cross-examine you on testimony given by you at an earlier hearing in this matter, at which time the alien was not represented by an attorney at the hearing, and in which your testimony was received in spite of that fact—"

The witness stated that he also had taken part in the seizure of the papers at the alien's home after the latter's arrest. The officer

testified that Vilarino's wife had invited the police to come into the house, and, referring to the Communist papers, had exclaimed: "For God's safe, come in and take them away!"

A third peace officer who testified fixed the date of the raid on Vilarino's home as March 1, 1930.

At the close of the hearing of March 15, 1930, the alien's attorney announced that he intended to file a brief within ten days after receiving the transcript. According to the "Transmission of Record of Warrant Proceedings" sent to Washington on May 7, 1930, by the inspector in charge, the appellee herein, a copy of the record of that hearing had been transmitted to the attorney on March 28, 1930, and he had been advised that he would be given ten days in which to file a brief. The brief had not been received, the "Transmission" further set forth.

Accordingly, the Assistant to the Secretary of Labor on August 23, 1930, having affirmed the findings of the Board of Review, issued a warrant for the deportation of Vilarino on the two grounds heretofore stated.

We turn now to the three allegations of "unfairness" in the deportation proceedings, put forth by counsel for the appellant.

■ It is contended that "incompetent evidence" was received against the appellant, in that the Communist literature seized without a search warrant was admitted at the hearing of March 15, over the objection of counsel seasonably made.

The allegedly illegal search and seizure were made by police officers, acting, according to the uncontradicted testimony of two of them, in the enforcement of a state statute. Evidence obtained under such circumstances, in the absence of co-operation of federal and state authorities in the given case, is admissible in a subsequent federal proceeding.

This principle is clearly set forth in Weeks v. United States, 232 U. S. 383, 398, 34 S. Ct. 341, 346, 58 L. Ed. 652, in the following language: "As to the papers and property seized by the policemen, it does not appear that they acted under any claim of Federal authority such as would make the (Fourth) amendment applicable to such unauthorized seizures. The record shows that what they did by way of arrest and search and seizure was done before the finding of the indictment in the Federal court; under what supposed right or authority does not appear. What remedies the defendant may

have against them we need not inquire, as the 4th Amendment is not directed to individual misconduct of such officials. Its limitations reach the Federal government and its agencies. Boyd Case, 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746, supra, and see Twining v. New Jersey, 211 U. S. 78, 29 S. Ct. 14, 53 L. Ed. 97." See, also, Burdeau v. McDowell, 256 U. S. 465, 41 S. Ct. 574, 65 L. Ed. 1048, 13 A. L. R. 1159; Byars v. United States, 273 U. S. 28, 32, 33, 47 S. Ct. 248, 71 L. Ed. 520.

The facts in the Weeks Case, indeed, were not so strong in favor of admissibility of such evidence as those in the instant case. In the former, there was co-operation between the United States marshal and the police in one of the searches and seizures. As to the articles obtained in that particular search, the holding of the Supreme Court was that they should have been restored to the accused. But the co-operation of marshal and police as to one particular seizure did not vitiate the character of the evidence seized by police officers alone, in another and separate search.

■ In the instant case, there was no search or seizure by federal officers at any time. There has not been adduced a scintilla of evidence as to prior co-operation of federal and state authorities. The mere facts that no state prosecution was actually instituted against Vilarino and that the documents seized were indeed turned over to the United States immigration authorities do not of themselves create an inference of prior co-operation. Many factors may have supervened between the seizure and the immigration hearing to prevent the institution of a state prosecution; and in the Weeks Case the articles seized by the police only, and later declared to be competent evidence, were in fact turned over to the marshal. Furthermore, in the Weeks Case, there was likewise an absence of showing that a state prosecution had been instituted. Nevertheless, the evidence obtained by state officers was not vitiated.

The appellant, however, relies heavily upon the case of Gambino v. United States, 275 U. S. 310, 48 S. Ct. 137, 139, 52 A. L. R. 1381, 72 L. Ed. 293, in which it was held that, where the wrongful search and seizure were made solely on behalf of the United States, even by state officers, and the evidence so secured was the foundation for the prosecution, and supplied the only evidence of guilt, admission in evidence of the liquor wrongfully

seized violated rights of the defendants guaranteed by the Fourth and Fifth Amendments to the Constitution of the United States. The Supreme Court, however, carefully distinguished the facts there presented from those of the Weeks Case: "In Weeks v. United States * * * the papers not ordered returned had been obtained by a policeman who searched the defendant's home after his arrest by another state officer. * * * It was not shown there that either the arrest or the search was made solely for the purpose of aiding in the prosecution of the federal offense. A law of the state made criminal the acts with which the defendant was charged, and the seizure may have been made in enforcing the state law."

In neither case did the court stop to inquire whether or not a prosecution under the state law had in fact been instituted. A "charge" was sufficient; and a "charge" is disclosed in the instant case.

In the Gambino Case, the controlling question was whether or not there was in fact a state statute under which the defendants might have been prosecuted. The court held that, in view of the repeal of the Mullan-Cage Law, the state prohibition act of New York, there was no such state statute.

The Communist literature seized in the instant case by the police officers, during a visit to the appellant's home, without prior co-operation of federal authorities, was therefore admissible against the appellant at the hearing of March 15, 1930.

According to that literature, ownership of which was admitted by Vilarino, it is clear that the Communists do advocate the overthrow of the government of the United States by force or violence. One or two excerpts from those documents will be sufficient to establish that fact:

"The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by the forcible overthrow of all existing social conditions. Let the ruling classes tremble at a Communistic revolution. The proletarians have nothing to lose but their chains. They have a world to win.

"Working men of all countries, unite!" From the Communist Manifesto, by Karl Marx and Frederick Engels, p. 58.

The Membership Book No. 488 of the Communist Party of the United States (section of the Communist International) contains the following inscription on the first page:

"Name: John Vilarino.

"Date Admitted to Communist Party: 1926.

"Entered Revolutionary Movement: 1907."

It is clear from the foregoing that the Communist teaching is one of force; it is equally clear that Vilarino, being able to read English, was aware of his party's teaching.

■ Quite apart, however, from the question of the propriety of admitting the Communist documents in evidence at the hearing before the immigration inspector, there was sufficient other competent and substantial evidence offered to warrant this court to refrain from disturbing the Department's findings. If there was substantial evidence, and if the hearing was fair, a finding of fact by the executive department is conclusive, unless there was an application of an erroneous rule of law. Ng Fung Ho v. White, 259 U. S. 276, 284, 42 S. Ct. 492, 66 L. Ed. 938; Tisi v. Tod, 264 U. S. 131, 133, 44 S. Ct. 260, 68 L. Ed. 590; Bilokumsky v. Tod, 263 U. S. 149, 153, 44 S. Ct. 54, 68 L. Ed. 221 (rule as to "a finding of an essential fact unsupported by evidence"); Louie Lung Gooey v. Nagle, 49 F.(2d) 1016.

In the instant case, the alien, in the presence of his counsel, repeatedly admitted his membership in the Communist Party; and the testimony of Lieutenant Hynes, of the Los Angeles police department, who was cross-examined, was clear and undisputed as to the violence advocated by the Communists. The doctrines of this group, indeed, have already been passed upon by this court. Kenmotsu v. Nagle, 44 F.(2d) 953, 955. In that case, also, there was contained the following statement of the right of review to be exercised by the courts in cases like the one before us now: "Moreover, the right of the courts to review the action of the department having the authority to adjudge the facts extends only so far as to determine that the warrant of deportation was not arbitrarily issued, or issued as the result of an unfair hearing." See, also, Cahan v. Carr, 47 F.(2d) 604, 605 (C. C. A. 9).

■ The second ground urged in the appellant's brief is that the alien was not accorded the right of counsel at all stages of the proceedings.

The presence of alien's counsel at the first hearing before the inspector on March 1 was not necessary. This view is amply supported by previous decisions of this court. In Ernatsu Kishimoto v. Carr, 32 F.(2d) 991,

992, this court used the following language: "Inasmuch as the petitioner was given repeated hearings by the respondent and by the Department of Labor while he was represented by counsel and was then permitted to present any evidence he desired and also to cross-examine all the witnesses against him, the claim of unfairness in the proceedings simmers down to the claim that it was an invasion of the appellant's right to a fair hearing to obtain a statement from the appellant while he was in custody and before he secured the services or advice of counsel. This position cannot be maintained. Chan Wong v. Nagle (C. C. A. 9) 17 F.(2d) 987; Plane v. Carr (C. C. A. 9) 19 F.(2d) 470." See, also, Chin Shee v. White, 273 F. 801, 805, likewise decided by this court, and United States v. Chan Nom Gee (D. C. Wash.) 47 F.(2d) 758, 759.

■ Finally, the appellant urges that the defendant was not accorded the right of cross-examination at all stages of the proceedings. This point is not well taken. As we have seen in our survey of the testimony, after the sole witness had testified at the first hearing, the alien was asked what he had to say in regard to the witness' statements. At first the alien refused to answer the question, but immediately afterward gave his version of a conversation reported by the witness.

At the hearing of March 15, 1930, the same witness appeared, and the attorney for the alien made the following preliminary statement to him: "The inspector has kindly given me opportunity to cross-examine you on the testimony given by you at an earlier hearing in this matter." This statement alone establishes the fact that counsel for the alien had ample opportunity to cross-examine the only witness examined at the first hearing.

Counsel cites two cases in support of each of his three grounds of attack upon the fairness of the hearings before the inspector: Ungar v. Seaman (C. C. A. Minn.) 4 F.(2d) 80, and Ex parte Radivoeff (D. C. Mont.) 278 F. 227. Each of these cases, however, presents a state of facts quite different from that in the instant case. In Ungar v. Seaman, the warrant of arrest charged one offense and the warrant of deportation another. In the Radivoeff Case, the warrant of arrest was without probable cause, supported by oath and affirmation, and free cross-examination was prevented. In each case, "hearsay" or "ex parte and incompetent" evidence was introduced over the objection of counsel.

Two cases presenting similar questions of law have been decided recently in other circuits, according to the principles followed in the present opinion. In United States ex rel. La Buda v. Karnuth et al., 47 F.(2d) 945, involving statements by an alien made before the issuance of a warrant of arrest, the Circuit Court of Appeals of the Second Circuit affirmed an order sustaining the deportation, which happened to be issued by the same District Judge who heard the instant case in the court below.

In the case of McCandless v. United States ex rel. Murphy, 47 F.(2d) 1072, the Circuit Court of Appeals for the Third Circuit held that the contention of an alien "that she was taken to the immigration station without previous arrest and there questioned in no way affects her status as subject to deportation as one unlawfully entering the country." The court there applied the doctrine of Bilokumsky v. Tod, supra, to the effect that "irregularities on the part of the government official prior to, or in connection with, the arrest would not necessarily invalidate later proceedings in all respects conformable to law." In the case at bar, the lack of counsel and the alleged lack of opportunity for cross-examination occurred before the immigration warrant of arrest had been even asked for. See United States v. Myers (D. C.) 46 F.(2d) 317.

A study of the transcript of the hearing of March 15, 1930, discloses that it was fair; that the alien was represented by able and zealous counsel; that ample opportunity was had for cross-examination of all witnesses appearing against the alien; and that there was adduced substantial and competent evidence to support an executive department's findings of facts and warrant of deportation. Scrupulous regard was accorded at the hearing of March 15 to the alien's rights to counsel and opportunity for cross-examination. The documentary evidence as to the teachings of the Communist Party admitted during the hearing of March 15 was then and there coupled with the alien's voluntary admission of Communist membership and by the testimony of one of the officers as to what such membership means.

Judgment affirmed.