**UNITED STATES v. ROSEN.**

No. 209, Docket 21293.

United States Court of Appeals
Second Circuit.

April 25, 1949.

Before AUGUSTUS N. HAND, CHASE and CLARK, Circuit Judges.

Emanuel H. Bloch, of New York City, for appellant.

John F. X. McGohey, U. S. Atty., of New York City (Thomas F. Murphy, Asst. U. S. Atty., of New York City, and Thomas J. Donegan and Fred E. Strine, Special Assts. to the Atty. Gen. of counsel), for appellee.

CHASE, Circuit Judge.

The appellant was adjudged in contempt of court for refusing to obey an order of the court directing him to answer certain questions he had been asked when he appeared as a witness before a grand jury duly summoned and sitting in the Southern District of New York on March 2 and 3, 1949. He was sentenced to imprisonment for six months or until such time as he purged himself by answering the questions.

There were eleven questions which the appellant refused to answer after a hearing before the court had resulted in the order directing him to do so. His refusal to answer each question was for the claimed reason that his answers would tend to incriminate him and the order adjudging him in contempt is now attacked as erroneous in that it denied him the protection against self incrimination which the Fifth Amendment provides.

The questions which he refused, on the above ground to answer are as follows:

"Q. * * * I show you Grand Jury Exhibit No. 103, which is a certificate of title of a motor vehicle issued by the Director of Vehicles & Traffic of the District of Columbia, for a Ford roadster, which certificate contains a purchase application for new certificate of title, bearing the name William Rosen, signature William Rosen, and an affidavit given before Notary Public Henry J. Gertler on July 23rd, 1936, and I ask you have you seen this document in any form, either the original or the copy, have you previously seen this document in any form either the original or the copy? * * * Prior to the time the committee or any representative of the Committee on Un-American Activities exhibited to you a copy of that document, had you ever seen the original or a copy of the document?

"Q. Mr. Rosen, Judge Rifkind instructed you in court on March 3rd that you were to answer the question that was asked you as to whether you desired to change your answer of 'No' to the question as to whether you knew Mr. Gertler, and that is what I am asking you, do you desire to change your answer of 'No' to the question as to whether you knew Mr. Gertler, as to whether you ever met or had any conversation with Mr. Gertler? * * * I again ask you the question as to whether you desire to change your answer before the grand jury on March 3rd when you said 'No' to the juror's question as to whether you had ever met or had any conversation with Mr. Gertler?

"Q. Mr. Rosen, did you ever own a Ford roadster? That question was asked you on March 3rd in the grand jury room, and Judge Rifkind instructed you when you appeared before him to answer the question. What is your answer?

"Q. Mr. Rosen, I am again asking you a question which you were asked in the grand jury on March 3rd, 1949, and which Judge Rifkind instructed you to answer: 'Mr. Rosen did you ever own a Ford automobile?'

"Q. I am now asking you a question which was asked you before the grand jury on March 3rd, 1949 and which Judge Rifkind instructed you to answer: 'Mr. Rosen, did you ever seek to obtain a certificate of title or to register a Ford automobile at any time?'

"Q. Mr. Rosen, I am again asking you a question which was asked before the grand jury on March 3rd, 1949, and which Judge Rifkind on that same date instructed you to answer: 'Did you appear before a notary public, Henry J. Gertler, in Washington, D. C., on July 23rd, 1936?'

"Q. Mr. Rosen, I am again asking you a question which you were asked by a juror in the grand jury room on March 3rd, 1949 and which Judge Rifkind instructed you to answer on the same date when you appeared before him in court. Question by a juror: 'Well, if you were not in Washington, if it is true that you were not in Washington on that particular day, how could you possibly have had any connec-

tion with the signing of this document and, therefore, why can't you say that you did not sign that document or that you did not appear before Mr. Gertler?'

"Q. Mr. Rosen, I am again asking you a question which you were asked before the grand jury on March 3rd, 1949 and which Judge Rifkind subsequently instructed you to answer: 'Did you ever purchase an automobile from any automobile dealer either in Washington or New York other than the Cherner Motor Company?'

"Q. The next question was, 'I correct my question: What model of Ford car did you drive?'

"Q. I am asking you a question, Mr. Rosen, which you were previously asked before the grand jury on March 3rd, 1949, and which question judge Rifkind on that same date instructed you to answer: 'Mr. Rosen, were you ever on the premises of the Cherner Motor Company, 1781 Florida Avenue, N. Y., Washington, D. C.?'

"Q. Did you ever purchase an automobile in Washington, D C.?"

■ As they do not on their face appear to call for answers which would tend to incriminate the appellant, it was incumbent upon him to justify his refusal to answer on the ground claimed by making it appear that his assertion that they would was based upon substantial reason so to believe and was not made merely to protect some other person or persons. Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L. Ed. 1110; Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819; Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198; United States v. Zwillman, 2 Cir., 108 F.2d 802; United States v. Weisman, 2 Cir., 111 F.2d 260; United States v. Cusson, 2 Cir., 132 F.2d 413.

In an effort to do that he introduced evidence at his hearing from which it appears that he had reasonable cause to believe that the "setting" in which he was asked the above questions was substantially as follows.

At a series of hearings in the summer of 1948 before a standing committee of the House of Representatives, and of sub-committees, a witness, Whittaker Chambers, had testified that both in 1935 and 1936, as

well as for a period before and after those years, he had been acting as an agent of the so-called "underground" of the Communist Party which was engaged in behalf of Russia in espionage activities in this country. Later Chambers also had testified that he had received confidential information from public servants of the United States in Washington while he was an agent of the Communist "underground," which was the secret espionage branch of the Communist Party, and that some of this information was contained in confidential documents of the State Department which were delivered to him by Alger Hiss, an employee of that department, to be photostated or microfilmed. He had also testified that he had returned the originals to Hiss shortly after he had received them but after he had had them photostated or microfilmed. He had also testified that Hiss was a dues paying member of the Communist Party with whom he was well acquainted and with whom he had discussed at length the principles of Communism especially in its relation to this government. The import of his testimony was that Hiss had been a disloyal employee of the State Department engaged in espionage against his own country for the benefit of Soviet Russia and was so acting in furtherance of a conspiracy to overthrow this government by force and violence in which the members of the underground of the Communist Party in America were his co-conspirators.

Hiss, who was privately employed in New York when Chambers so testified, learned he had been so accused and denied emphatically any connection with such activities or with Chambers. He requested that he be permitted to appear before the committee to enable him to refute the charges without delay, and his request was granted. He testified positively that he was entirely innocent; that he did not know Chambers; and that he was unable to recognize a picture of Chambers which was shown to him as that of anyone he knew under any other name. He expressed disappointment that Chambers was not present so that he could see him and asked for that opportunity. Hiss subsequently appeared several times before the committee and its sub-committee and for a time was unable to suggest anyone he might have known who could have been Chambers under some other name. Chambers not only continued to maintain, after Hiss's denials, that he had testified truthfully but amplified his testimony as to his acquaintance and activities with Hiss. After hearings had been held on several days, Hiss stated that it had but recently occurred to him that Chambers might be a freelance writer, known to him as Crosley, who had visited him, when Hiss was attorney for the Nye Committee that was investigating the munitions industry, to get materials for articles he intended to write and hoped to sell to magazines. He described his recollection of him, said he had in 1935 sub-let his apartment to him and at first said he had then sold Crosley an old Ford Model A roadster which he had purchased shortly before he was married and which accordingly had a sentimental value but was otherwise of no particular use to him as he had a new car. He explained that the roadster had been turned over to Crosley as an incident of the subleasing of the apartment and that Crosley was to pay him only the same rent, while he occupied the apartment with his family, as would be payable under the lease by Hiss to his lessor. At a subsequent meeting of a sub-committee in New York Chambers and Hiss were both present. At first Hiss could not recognize Chambers as Crosley but after he had looked at his teeth and had heard him answer some questions, Hiss did identify Chambers positively as the man he had known as Crosley. He persisted, however, in his denial that he was, or ever had been, a member of the Communist Party or that he had furnished any confidential State Department information to the man he had known as Crosley.

Chambers firmly maintained that he had never been known as George Crosley and that he had testified truthfully concerning his relations with Hiss and denied that he had ever sub-let an apartment from Hiss or bought a car from him or had received any car from him.

It had now become quite clear that either Hiss or Chambers was guilty of perjury. Chambers had testified at considerable

length concerning espionage by a group of men, in which he placed Hiss, who he said were members of the Communist "underground" and formed what was called an "apparatus" for subversive operations. His credibility as well as that of Hiss was a material matter for the Committee to pass upon in making its finding of facts relating to the investigation it was conducting. And so the truth as to what Hiss had done with the car he said he had turned over to Chambers, whom he said he had known as Crosley, was investigated.

It turned out that the title to this particular roadster, as shown by the public records of the District of Columbia, had been transferred by Hiss on July 23, 1936, which was a year or more after the time when Hiss had testified that he had turned over the car to Chambers in connection with the sub-letting of the apartment. On that day, Hiss had signed a certificate of title, and acknowledged his signature before a notary public in Washington, transferring the title to the Cherner Motor Company of Washington, D. C. On the same day, so the record showed, the title had been transferred to one William Rosen whose Washington address was given. The application for that title was signed William Rosen and at Washington acknowledged by him before Henry J. Gertler, Notary Public.

If this were all there would be no sufficient showing of danger to William Rosen, but additional circumstances require a contrary conclusion. It was shown that the Cherner Motor Co. was a dealer in new and second hand cars which customarily kept a record of all cars which passed through its hands. Although its records for that day and for a reasonable time before and after it were examined and found to show no inherent evidence of any abstraction, the company had no record concerning this car.

Moreover, Chambers had not only testified that Hiss had not turned the car over to him in 1935 but when asked what Hiss did with the car had testified as follows:

"The Communist Party had in Washington a service station—that is, the man in charge or owner of this station was a Communist—or it may have been a car lot.

"Mr. Nixon: But the owner was a Communist?

"Mr. Chambers: The owner was a Communist. I never knew who this was or where it was. It was against all the rules of underground organization for Hiss to do anything with his old car but trade it in, and I think this investigation has proved how right the Communists are in such matters, but Hiss insisted that he wanted that car turned over to the open party so it could be of use to some poor organizer in the West or somewhere.

"Much against my better judgment and much against Peters'[1] better judgment, he finally got us to permit him to do this thing. Peters knew where this lot was and he either took Hiss there, or he gave Hiss the address and Hiss went there, and to the best of my recollection of his description of that happening, he left the car there and simply went away and the man in charge of the station took care of the rest of it for him. I should think the records of that transfer would be traceable."

This appellant was then summoned to appear before the Committee and did so with his attorney on two occasions. At his first appearance, he refused on the ground of self-incrimination to answer any questions about this car or concerning the transfer of the title to this car. He also declined to answer some questions about automobiles he had owned and as to whether he had been in Washington in 1935.

His wife was then summoned to appear before the Committee and, though she refused to answer questions concerning this car, she did testify that her husband had never owned a Ford automobile and that he had not been in Washington in 1935.

Upon the appellant's second appearance before the Committee he again refused to answer any questions about this car but did testify somewhat more extensively than

[1] Peters was identified by Chambers as his superior and the man then at the head of the Communist underground in the United States.

at first and, among other things, that he had not been in Washington in 1935. It was shown that the address given as that of William Rosen in Washington on the application for the certificate was not then that of the appellant and that it never had been his address.

Following these occurrences Alger Hiss testified before a special federal grand jury which was convened on June 16, 1947 in the Southern District of New York to investigate possible violations of the espionage laws of the United States and any other federal criminal statutes. Among other questions he was asked the following to which he gave the following answers.

"Q. Mr. Hiss you have probably been asked this question before, but I'd like to ask the question again. At any time did you, or Mrs. Hiss in your presence, turn any documents of the State Department or of any other Government organization, or copies of any other Government organization, over to Whittaker Chambers? A. Never. Excepting, I assume the title certificate to the Ford.

"Q. In order to clarify it, would that be the only exception? A. The only exception.

"Juror: To nobody else did you turn over any documents, to any other person?

"The Witness: And to no other unauthorized person. I certainly would have to other officials.

"Q. Now, Mr. Hiss, Mr. Chambers says that he obtained typewritten copies of official State documents from you. A. I know he has.

"Q. Did you ever see Mr. Chambers after you entered into the State Department? A. I do not believe I did. I cannot swear that I did not see him some time, say in the fall of '36. And I entered the State Department September 1, 1936.

"Q. Now, you say possibly in the fall of '36. A. That would be possible.

"Q. Can you say definitely with reference to the winter of '36. I mean, say, December '36? A. Yes I think I can say definitely I did not see him.

"Q. Can you say definitely that you did not see him after January 1, 1937? A. Yes, I think I can definitely say that.

"Mr. Whearty: Understanding, of course, exclusive of House hearings and exclusive of the Grand Jury.

"The Witness: Oh, yes."

As a result of this testimony, conflicting with that of Chambers, he was indicted for perjury. What had transpired as above outlined was known to the appellant when he refused to answer these questions when he appeared as a witness before the grand jury. He then knew that evidence had been produced which tended to show that in and after 1935 Hiss had been guilty of substantive federal crimes including among them violations of the laws relating to espionage and had been conspiring with others to violate such laws. He knew that the disposition by Hiss of this Ford car which he had used while engaged in such unlawful activities had become a matter material to the investigation being conducted by the grand jury. He knew that a certificate of title to that car had been recorded in Washington which purported to show that the title had been transferred to him upon his signed application for it and that his signature appeared to have been acknowledged by him before a notary public in Washington. He also knew that the Cherner Motor Company which appeared on the certificate as the transferor of the title to him had no record of this car although in the ordinary course of its business it did keep records of each car passing through its hands, and that it had been alleged that the car was to be transferred indirectly to the Communist party. He knew, therefore, that there were peculiar and unusual circumstances regarding his purported connection with the car and that the grand jury was seeking evidence to show just what they were and what they signified.

His relation to the activities of the other witnesses was one of those circumstances. Granted that the statute of limitations had already run on any substantive crime he may have committed in 1936 when the title to this car was of record transferred to him, he is nevertheless not immune from

possible prosecution. The evidence which tends to show that Hiss was guilty of criminal conspiracy may also show, or be supplemented to show, that such conspiracy has continued to exist and to be carried out ever since or at least to a date not now affected by any statute of limitations. Such evidence may show that the appellant was, and perhaps is, a co-conspirator in that or related conspiracies for which he may be prosecuted.

■ While the case against Hiss involved charges which he has flatly denied and which have not yet been tried, the questions asked Rosen appear to involve him in these charges. Under these circumstances Rosen was justified in believing that he was in a precarious situation and in view of the authorities above cited he had the right to refuse to answer questions which might connect him with the Ford car, or might lead to the discovery of evidence connecting him with it, or otherwise link him up with any alleged conspiracy.

We have made no attempt to distinguish between the questions in the group. They obviously were all asked to elicit information concerning the appellant's connection, if any, with the disposition made of the Ford car and that was the only apparent basis of their materiality.

Order reversed.