**ALEXANDER v. UNITED STATES and nine other titles.**

No. 12081.

United States Court of Appeals
Ninth Circuit.

Feb. 4, 1950.

As Amended Feb. 7, 8, 1950.

Mathews, Healy and Bone, Circuit Judges, dissented.

For former opinion, see 173 F.2d 867.

See also 173 F.2d 865, 181 F.2d 489, 181 F.2d 632.

481

---

Margolis & McTernan and Esther Shandler, Los Angeles, Cal., for appellants.

James M. Carter, U. S. Atty., Los Angeles, Cal., Max H. Goldschein, Sp. Asst. to Atty. Gen., Frank De Nunzio and Vincent Russo, Sp. Assts. to Atty. Gen., for appellee.

A. L. Wirin and Fred Okrand, Los Angeles, Cal., for American Civil Liberties Union as amicus curiæ.

Daniel G. Marshall and Sam Houston Allen, Los Angeles, Cal., for Los Angeles & Hollywood-Beverly Hills Chapters National Lawyers' Guild, as amicus curiæ.

J. Bruce Fratis, George Olshausen and Benjamin Dreyfus, San Francisco, Cal., for San Francisco Chapter, National Lawyers Guild, as amicus curiæ.

Before DENMAN, Chief Judge, and MATHEWS, STEPHENS, HEALY, BONE and ORR, Circuit Judges.

A rehearing in banc is hereby ordered. The parties have stipulated that the ten instant appeals be submitted on the briefs heretofore filed herein and the briefs and record in Doran v. United States, 9 Cir., 181 F.2d 489, and Kasinowitz v. United States, 9 Cir., 181 F.2d 632, appeals pending here, in which are presented similar contentions. The opinion on the merits follows.

Before DENMAN, Chief Judge, and MATHEWS, STEPHENS, HEALY, BONE, ORR and POPE, Circuit Judges.

DENMAN, Chief Judge.

These are ten appeals from judgments and commitments in civil contempt, based upon refusals to answer questions put to appellants while witnesses in an investigation by a grand jury of the District Court for the Southern District of California. The refusals were based upon the claim that the answers would tend to incriminate them. A hearing was had before the district court for each appellant and the court ordered the questions answered. The refusals led to the judgments.

The questions asked may be briefly summarized as follows:

Appellants Bissey, Noble and Smith were asked substantially the following questions:

1) Do you know the names of the county officers of the Los Angeles County Communist Party?

2) Do you know the table of organization of the Los Angeles County Communist Party?

3) Do you know Ned Sparks?

Appellants Alexander, Forest, Kasinowitz and Steinberg were asked substantially the following questions:

1) Do you know the names of the county officers of the Los Angeles County Communist Party?

2) Do you know the table of organization and duties of the Los Angeles County Communist Party?

Appellant Dobbs was asked substantially the following questions:

1) The questions heretofore described in connection with the first group of appellants just above, and in addition thereto,

2) "By whom are you employed"; this question having been asked after appellant Dobbs had testified that his occupation was "an organizer."

Appellant Bock was asked the following questions:

1) The questions described in connection with the second group of appellants just above, and in addition thereto,

2) "An organizer for whom?"; this question having been asked after the witness had testified that he was an organizer.

Appellant Sherman was asked the following questions:

1) Do you know the names of the county officers of the Los Angeles County Communist Party?

2) Do you know Ned Sparks?

To eight of these appellants, Assistant Attorney General Goldschein made statements calculated to persuade them that their answers to such questions could not incriminate them. Typical is the following:

"Q. By Mr. Goldschein: Your name is Frank Edward Alexander, is that right? A. Yes.

"Q. Where do you live? A. 78 Hurlburt Street, Pasadena.

"Q. I want to let you know before we start that you are not under investigation by this grand jury for any offense. You are merely called here as a witness to give evidence that you may have of certain facts that the grand jury is interested in. Do you understand that? A. I do.

"Q. Now, do you know the names of the county officers of the Los Angeles Communist Party? A. I refuse to answer that on the basis it may incriminate me."

"Q. Do you know the *table of organization and the duties of the county officers of the Los Angeles County Communist party?* A. I refuse to answer that on the basis it might incriminate me." (Emphasis supplied.)

It is obvious that, whether or not the grand jury was investigating the witness "for any offense," he might give answers incriminating him as one violating the Smith Act, later considered. The Assistant United States Attorney General pursued the same tactics tending to put the witness off his guard in similar grand jury proceedings reviewed by the Court of Appeals for the Tenth Circuit in Rogers v. United States, 179 F.2d 559, where that court said:

"Goldschein's stock statement to the witness that she was not under investigation and that the grand jury was not proceeding against her, was not warranted. It was not for him to say what the scope of the grand jury's investigation was; neither was his statement a substitute for her constitutional protection."[1]

While none of the witnesses rose to this lure, it is the duty of this court not to pass unnoticed such conduct of a prosecuting officer towards any of the circuit's litigants when it appears in the record before us.

These questions, "Do you know the names of the county officers of the Los Angeles County Communist Party?" "Do you know the table of organization and the duties of the county officers of the Los Angeles County Communist Party?" and other questions asked do not, on their face, require incriminating answers. Hence the burden is on appellants to show they had substantial reason to believe they call for answers tending to incriminate them. Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; United States v. Rosen, 2 Cir., 174 F.2d 187, 188, certiorari denied 338 U.S. 851, 70 S.Ct. 87.

The contention of the appellants is that they had a reasonable apprehension that the object of the investigation was something more than the purpose declared by government counsel to seek government employees who had falsely answered questions respecting their loyalty in violation of 18 U.S.C.A. § 1001. That something more is the reasonable apprehension of an investigation as to all persons who might be members of various subordinate divisions of the Communist Party of the United States as a part of a general movement by the Attorney General of the United States to prosecute them under the Smith Act, as were the persons convicted in the Southern District of New York before Judge Medina.

The peculiar selectivity of the ten appellants was further likely to convince them that the proceeding before the grand jury was a part of such a national investigation. All were served at seven o'clock or shortly thereafter in the morning, a most unusual

---

1. Not irrelevant to what the record here shows is that court's further comment: "There is much in the record warranting the conclusion that the purpose of the investigation by Goldschein, the Government's Special Representative before the grand jury, was to unearth the activities of the Communist Party of Colorado, rather than to unearth violations of 18 U.S.C., Paragraph 80 [now 18 U.S.C.A. § 1001], as stated in the presentments."

time to seek to procure grand jury witnesses. Eight were ordered to appear before the grand jury at ten o'clock on the same morning, a time so short as to raise the suspicion that no opportunity would exist for them to make a collective defense in such an investigation. The United States attorney admitted that the group was selected because he thought he would "obtain from them the whereabouts of the records of the Los Angeles County Communist Party membership." That they were indeed a selected group having a common need for such protection is apparent from the fact that, in this less than three hours in the early morning, each of the eight had somehow managed to select the same attorneys to appear for him and that at ten o'clock these attorneys did make such appearance for each.

The principal argument made by the government is that such questions as to the membership and organizational setup of the Communist Party of Los Angeles could not possibly incriminate the appellants on a charge of such membership or affiliation with such members because of the decision of the Supreme Court in Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796.

This is an extraordinary argument. The Schneiderman case decided that the evidence before it *was insufficient to show* the Communist Party advocated the overthrow of the government by force. It stated 320 U.S. at page 157, 63 S.Ct. at page 1352:

"There is a material difference between [1] agitation and exhortation calling for present violent action which creates a clear and present danger of public disorder or other substantive evil, and [2] mere doctrinal justification or prediction of the use of force under hypothetical conditions at some indefinite future time * * *."
and 320 U.S. at page 158, 63 S.Ct. at page 1352 held:

"Under the conflicting evidence in this case we cannot say that the Government has proved by such a preponderance of the evidence that the issue is not in doubt, that the attitude of the Communist Party of the United States in 1927 towards force and violence was not susceptible of classification in the second category. * * * In so *holding* we do not decide *what interpretation of the Party's attitude toward force and violence is the most probable on the basis of the present record,* or that petitioner's testimony is acceptable at face value." (Emphasis supplied.)
being preceded by the following 320 U.S. at page 155, 63 S.Ct. at page 1351:

"*On the basis of the present record* we cannot say that the Communist Party is so different in this respect that its principles stand forth with perfect clarity, and especially is this so with relation to the crucial issue of advocacy of force and violence, upon which the Government admits the evidence is sharply conflicting." (Emphasis supplied.)

We do not agree that, because of the Schneiderman decision in 1943, in 1948 the branch of the Communist Party in Los Angeles could not possibly be composed of persons organized in violation of the Smith Act to overthrow the government by force or to teach such overthrow or composed of persons affiliating with such an organization.[2]

The pertinent portion of the Smith Act, 18 U.S.C.A. § 2385 is:

"Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any society, group, or assembly of persons, knowing the purposes thereof— * * *."

Aside from the particular selection of these 15 persons, the evidence offered to show a reasonable apprehension that the Los Angeles grand jury investigation is a part of an announced plan of the Attorney

2. Contrary views of this court appear in the following cases: Ex Parte Vilarino, D.C., 50 F.2d 582; Kenmotsu v. Nagle, 9 Cir., 44 F.2d 953; Ex Parte Fierstein, 9 Cir., 41 F.2d 53, 54; Sormunen v. Nagle, 9 Cir., 59 F.2d 398, 399; Saksagansky v. Weedin, 9 Cir., 53 F.2d 13; Wolck v. Weedin, 9 Cir., 58 F.2d 928.

General of the United States to prosecute members of the Los Angeles Communist Party is as follows:

"1. Copy of an indictment returned in the United States District Court for the Southern District of New York against William Z. Foster and eleven others charging them with conspiracy to violate the Smith Act solely by virtue of their alleged activities in forming the Communist Party.

"2. Copy of an indictment returned by the same Grand Jury against one of the aforesaid twelve persons charging him with violation of the Smith Act *solely by virtue of his alleged membership* in the Communist Party, and a stipulation that eleven similar indictments were returned against the other eleven persons involved in the conspiracy indictment described above."

In addition appellants offered to prove the following:

"1. Motions to dismiss these indictments had been denied, and the cases arising out of these indictments were set for trial on November 1 or 2, 1948, and were presently pending.

"2. It was the announced plan and intention of the Attorney General to obtain a series of indictments, similar to Respondent's Exhibits A and B, throughout the United States, including specifically the City of Los Angeles, against other persons based solely upon their membership or alleged membership in the Communist Party.

"3. An administrative finding of the Attorney General under Executive Order 9835, 5 U.S.C.A. § 631 note, that the Communist Party is an organization which advocates the overthrow of the American form of government by force and violence.

"4. The Attorney General is causing to be instituted deportation proceedings against numerous persons upon the theory that the Communist Party advocates the overthrow of government by force and violence and that mere affiliation with the Communist Party is sufficient basis for deportation.

"5. The Attorney General has announced that it is the policy and position of his office that anyone who is a member of the Communist Party has violated the aforesaid provisions of the Smith Act and that this is the announced official policy of the government of the United States."

The five offers of proof were rejected by the court on the ground that they are immaterial. We do not agree. Nothing could be more likely to create apprehension of a prosecution for violation of the Smith Act than the matters so offered in proof.

The court also rejected further evidence offered to show the reasonable apprehension of prosecution. This consisted of newspaper reports that the Department of Justice had launched a nationwide drive against the Communist Party and its members under the Smith Act; that it had announced the impanelling of federal grand juries in Los Angeles and other cities to this end; that the prosecutors involved in the inquiry before which appellants were called made public statements that the inquiry was the "opening gun" in an investigation of "Communist groups and activities" and "subversive and disloyal groups."

None of this offered proof is in the nature of an inquisition of the Attorney General of his purposes. It concerns only his public statement of his purposes likely to affect the minds of appellants.

While the last mentioned items of evidence were newspaper articles and are therefore not competent evidence of the facts therein stated, they are competent to show the information available to appellants and the reasonableness of their fear of prosecution. This kind of proof has been specifically approved by the Second Circuit for purposes of showing the genuineness of the peril. United States v. Weisman, 111 F.2d 260, 262. Moreover here the newspaper articles, in the main, purported to be straight reporting and claim authoritativeness from high sources in the Department of Justice or actually quote the prosecutor handling the very inquiry before which appellants were summoned. They rise above the "irresponsible group" held not competent to show the danger of prosecution in the Weisman case, supra, 111 F.2d at page 262.

The accepted proof of the prosecutions in the New York district court, the purposeful selection of the group of appellants, together with the public anti-Communist agitation and that in the Congress, make it unnecessary to refer the case to the district court to accept the rejected proof, if made, and consider its effect on the minds of the appellant witnesses.

It is apparent that knowledge of a "table of organization" or "the duties of a Party" (hence its "county officers") seeking the overthrow of the government by force necessarily would be secret. Such law-defying conspirators do not circulate through the community telling how they are organized for such a purpose and the duties of those directing such action.

If any of the appellants be indicted for affiliation with or membership in the Los Angeles Communist Party as an organization either teaching or seeking the overthrow of the government by force, it well may be upon the prosecution to show the defendants' knowledge of the necessarily secret "table of organization" or "the duties" of such a Party. To answer, "Yes, I know their table of organization" or "I know the duties of the Party" would be an impugning supplying of the fact of his "knowing the purposes thereof" which is one of the essential factors in the crimes created by the Smith Act, supra.

Such an answer "might tend to show that he himself had committed a crime" and is much more than giving testimony which would be of use "to search out other testimony to be used in evidence against him" as in the Supreme Court's restatement of the principles of Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 198, 35 L.Ed. 1110, controlling the decision in Arndstein v. McCarthy, 254 U.S. 71, 73, 41 S.Ct. 26, 65 L.Ed. 138. In the latter case, succeeding Mason v. United States, infra, the Supreme Court said:

" 'No person * * * shall be compelled in any criminal case to be a witness against himself.' Fifth Amendment. 'This provision must have a broad construction in favor of the right which it was intended to secure.' 'The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime.' Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 197, 35 L.Ed. 1110.

"The protection of the Constitution was not removed by the provision in section 7 of the Bankruptcy Act [11 U.S.C.A. § 25]: 'No testimony given by him shall be offered in evidence against him in any criminal proceeding.' 'It could not and would not prevent the use of his testimony to search out other testimony to be used in evidence against him or his property.' Counselman v. Hitchcock, 142 U.S. 564, 12 S.Ct. page 198, 35 L.Ed. 1110."

In that case Arndstein was held not in contempt because, as stated by the court: "*It is impossible to say* from mere consideration of the questions propounded, in the light of the circumstances disclosed, *that they could have been answered with entire impunity*. The writ should have issued." (Emphasis supplied.) Arndstein v. McCarthy, supra, 254 U.S. page 72, 41 S.Ct. page 26. Here it is clearly *possible* to say that the answers would tend to impugn Alexander and the others of the group.

Here is not the "merely remote and naked possibility, out of the ordinary course of law and such as no reasonable man would be affected by," of Mason v. United States, 244 U.S. 362, 366, 37 S.Ct. 621, 622, 61 L.Ed. 1198. Here is exactly the prosecution that a *reasonable* man would expect if actually guilty of conspiracy or association with conspirators to violate the Smith Act or one innocently associating with such conspirators and ceasing the association on discovery of its unlawful character. Such a conspiracy prosecution as here feared has no semblance to the possible prosecution for violating the Alaska gambling statute in the Mason case. At that time there was in Alaska no such general conspiracy statute as that for defrauding the United States nor a specific statute against conspiring to engage in a gambling

game, such as the conspiracy statute in the instant case.

Learned Hand's opinion in United States v. Weisman, 2 Cir., 111 F.2d 260, 261, reversing the lower court, deals with an identical problem. There the question on which the witness claimed privilege was, "Did he know anyone who visited, lived in, or stayed at, Shanghai in the years 1934 to 1939?" As here, this question is innocuous on its face. As here, the witness showed a reasonable anticipation that he might be indicted for conspiracy to import narcotic drugs from Shanghai, just as exists a conspiracy indictment in New York and the Attorney General's likelihood to indict for conspiracy in Los Angeles.

Similarly, the opinion of Augustus Hand in United States v. Zwillman, 2 Cir., 108 F.2d 802, where the apparently innocuous question as to who were the witness' business associates in certain years was held likely to impugn him with reference to reasonably anticipated prosecution for a conspiracy to violate the liquor laws. The witness was prevented from showing that this answer might tend to incriminate him. There the district court again was reversed. See also the similar holding in United States v. Rosen, 2 Cir., 174 F.2d 187, 192.

Our decision in Miller v. United States, 9 Cir., 95 F.2d 492, 494, is not inconsistent with the impossibility rule of the Arndstein decision. There we affirmed the district court's conviction for a criminal contempt because, the burden being on the witness to show the trial court her apprehension of a prosecution in which her declined answer might tend to impugn her, the evidence on which the trial judge based his decision was not before us. As we stated, "Not having the evidence before us, we cannot say that it showed any such reasonable probability [of her answers impugning her]," nor even a 'possibility [her] answers would or could have any such effect.'"

Two of the witnesses, so justifiably refusing to answer the above questions, stated their occupation as "organizer." One refused to answer the further question, "By whom are you employed?" and the other the further question, "An organizer for whom?" Considering those with the other questions addressed to these appellants, it is clear that it is impossible for us to say that the answers would not have been "I am an organizer of a conspiratorial group violating the Smith Act," or, "I was once organizer of the Communist Party of Los Angeles County and though I ceased when I was required to violate the Smith Act, despite such cessation I reasonably anticipate an indictment charging such violation."

As to the four appellants, Bissey, Noble, Smith and Sherman, asked the above questions we hold impugning and in addition, "Did you know Ned Sparks?" the tie-in with the reasonable probability of the prior questions' incriminatory character is the offer to show that Mr. Sparks was a prominent officer of the Communist Party. These appellants' defense in a criminal prosecution well may be that they knew no one connected with the Communist Party's conspiracy to violate the Smith Act. The court erred in refusing this offer of proof.

■■ The judgments are reversed and the proceedings in the district court ordered dismissed as to the appellants except Bissey, Noble, Smith and Sherman.

As to the latter four, the case is remanded, the court's order refusing the offer of proof that Ned Sparks was a prominent officer of the Communist Party is set aside and the court instructed to permit them to make such proof if such they have.

DENMAN, Chief Judge, individually supplementing the court's opinion: In connection with the selective character of the group of appellants, as well as in connection with the assurances of the Assistant Attorney General to each of those so selected and to those of the Tenth Circuit, that he was not under investigation by the grand jury, the following portion of a published press release of the Department of Justice, dated June 15, 1949, describes the cases pending in this court as a part of the "prosecution * * * against communists in the United States":

"Prosecution action in the courts *against communists* in the United States was as follows:

\*   \*   \*   \*   \*   \*

"Sixteen *alleged communists* have been convicted in California on charges of civil contempt for refusing to testify before a Federal Grand Jury. Fifteen are out on bail, pending appeal to higher courts, and one was fined and paid $2500 for refusing to answer subpoena, thereby obstructing justice. He will be summoned to appear before the Grand Jury again. *Conviction of 10 of these 16 has been affirmed by the 9th Circuit Court of Appeals in San Francisco.* The appeals of the other 5 to the Circuit Court are pending.

"Seven *alleged communists* were convicted in Denver, Colorado, on charges of contempt for refusing to testify before the Federal Grand Jury in connection with the investigation of the alleged disloyalty of a government employee. They are out on bond pending an appeal to the Circuit Court." (Emphasis supplied.)

This press release was followed by a similar characterization of the cases pending here by the then Attorney General in a statement, published by him in his official capacity, giving his opinion of the accomplishments of his department against the "alleged communists", the judgments against whom are here reversed. His opinion is,

"The Department of Justice can point to a record of real *accomplishment against subversives in our midst.* \* \* \*

"Eleven top-flight Communists have been brought to trial in New York. William Z. Foster, the head of the Communist party, is sick and is awaiting trial.

"Thirty-four *alleged Communists* have been convicted in Washington for contempt of Congress.

"Twenty-five *alleged Communists* have been convicted in *California* on charges of civil contempt for refusing to testify before a Federal Grand Jury.

"Seven *alleged Communists* have been convicted in *Denver, Colorado,* on charges of civil contempt for refusing to testify before a Federal Grand Jury." (Emphasis supplied.)

Of course, neither the Attorney General in publishing his opinion (in the magazine "Look" on August 30, 1949), nor the Solicitor General directly in charge of the cases could have known of the assurances given by their Assistant Attorney General to the appellants here and those in Denver, Colorado, to the effect that their examination was not aimed at them to promote a "real accomplishment against subversives in our midst."[3]

The reason for this individual supplement to the opinion of Judges Stephens and Orr and myself is that we had not agreed on the form of the opinion until Thursday, February 2, 1950. On Friday afternoon, yesterday, February 3, 1950, I first learned of the public statement of the Department of Justice of its present and proposed prosecutions, treating these cases pending in our court as a part of the Department's "prosecution action in the courts against Communists." Today, Saturday, February 4, 1950, is the last day of the term of the grand jury in the Alexander civil contempt cases in which are ordered the appellants' incarceration until the questions are answered. The decision in that case would be moot if not made today. There is no time to assemble the judges agreeing on the court's decision for the consideration of the Department's statement.

The public report of the Department of Justice shows that, whether "poor people" or rich people, all the appellants, as a group, were selected by the prosecution to testify before the grand jury as "alleged Communists" in a nation-wide prosecution against Communists.

POPE, Circuit Judge.

I concur in the result reached but not in some of the things said in the opinion of Judge Denman, in which two of the other

3. Cf. Korematsu v. U. S., 323 U.S. 214, where at page 219, 65 S.Ct. 193, 89 L.Ed. 194, General DeWitt's final report of the evacuation of the Japanese, published long after the conviction of Korematsu, 323 U.S. at page 236, 65 S.Ct. at page 202, was considered relevant, though not before the lower courts.

members of the court have joined. The Smith Act provides that under certain circumstances membership in, or affiliation with a group of the kind described in the Act is in itself one of the elements of a crime. I think, therefore, that the proof that indictments based on this very section of the Act charging violation by virtue of membership in the Communist party were pending in New York, was sufficient to make the showing of reasonable ground to apprehend danger under the rule in United States v. Burr, Fed.Cas. No. 14,-692e, United States v. Mason, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198, and United States v. Rosen, 2 Cir., 174 F.2d 187, certiorari denied 338 U.S. 851, 70 S.Ct. 87. I believe that this is all that need be said to dispose of this case, and of the Kasinowitz and Doran cases, this day decided.

I am unable to perceive how any "peculiar selectivity" of the witnesses called, or that they all had the same attorneys, has any bearing on the decision. For aught that I know they may have employed the same attorneys because they were too poor to hire attorneys separately. And I think if one only of these witnesses had been called, without any "selectivity" with others, his rights would have been exactly the same.

As for the rejected offers of proof, I think it a mistake to give them the blanket blessing which Judge Denman does. The fact that the majority of the court agree that except for the offer as to Ned Sparks, the case can be disposed of without the offered and rejected evidence, demonstrates that we have found such offered and rejected evidence unnecessary to the decision. The question of how far a witness in such a case as this may inquire into the plans and intentions of the prosecutor is a matter which has not been sufficiently briefed nor adequately considered in this court. While in the Alexander case the offered evidence along this line related to public announcements of the Attorney General yet I think we should not by ruling upon matters which are not necessary to the decision encourage conclusions as to how far a rule admitting such evidence might logically lead. If some one testifies as to an alleged public statement by the

prosecutor, must the prosecutor either acquiesce in the witness' version, or take the stand and submit to cross-examination? In the companion case of Kasinowitz, the appellants called the United States Attorney and sought to interrogate him along these lines. They caused to be issued a subpoena for the Attorney General and in their affidavit opposing the Government's motion to quash the subpoena stated their purpose to examine the Attorney General as to the Department's plans and intended course of action. My own opinion is that it would be intolerable interference with the work of the United States Attorney if he must be subjected to an inquisition as to his plans and purposes in respect to future prosecutions merely because some recalcitrant witness chooses to test his constitutional privilege. I think this is not in the public interest. When a case arises in which the point is necessary to the decision the courts may well hold that this sort of evidence should be excluded because within the principle of those decisions which reject certain matters otherwise relevant for what Mr. Wigmore calls "extrinsic policy". All of this, I think, shows the unwisdom of trying to cross this bridge before we get there.

On the other side it should be said that a witness urging his privilege against incrimination should not be required to prove that the government had a presently formed plan to prosecute him, or others in his situation. When the witness has shown reasonable apprehension of danger, he has shown all that is required of him.

I think the approval of the offer of newspaper articles is particularly unfortunate. I know that in United States v. Weisman, 2 Cir., 111 F.2d 260, the court paid attention to newspaper stories, but I think it did so only in passing, and after commenting upon the evidence that this particular defendant had himself been investigated. In any event, I do not subscribe to any such rule of evidence, particularly in a case where the matter is unnecessary to the decision.

Finally, I think there is no warrant in the record, or in the legal questions before us, for the suggestion that the Special Assistant to the Attorney General pursued

"tactics tending to put the witness off his guard", or that he was calculatingly and in a reprehensible manner holding out a "lure" to the witnesses.

This court does not know, either from the record, or from its own knowledge, that the government attorney was not telling the truth. What he said to the witnesses is wholly immaterial as concerns their rights, for if what he said was true, it would still furnish no guaranty that the witnesses would not be the next on the list of suspects. I therefore think it is enough to say that it was not for the prosecutor either to grant or to withhold immunity.

We do know that the witnesses were all well represented by counsel and none failed to preserve his rights. We are not sitting in judgment on the prosecutor, and I would not like to comment on the propriety of what he did until I have heard his account of the matter.

I am therefore constrained thus not to permit Judge Denman's opinion to be more than that of a minority of the court.

MATHEWS, HEALY, and BONE, Circuit Judges (dissenting):

We think that the judgments in all these cases should be affirmed.

Mathews, Healy and Bone, Circuit Judges, dissented.